JIM WALTER CORPORATION,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 73-3656.

United States Court of Appeals,
Fifth Circuit.

July 31, 1974.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

632

Harry H. Root, III, Norman Stallings, Thomas C. MacDonald, Jr., Tampa, Fla., for plaintiff-appellant.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., Rodger M. Moore, Atty., Meyer Rothwacks, Chief, App. Sec., Dept. of Justice, Washington, D. C., John L. Briggs, U. S. Atty., Jacksonville, Fla., Bennet N. Hollander, Atty., Tax Div., Arthur L. Bailey, Atty., Justice Dept., Washington, D. C., Ronald H. Watson, Asst. Atty., Tampa, Fla., for defendant-appellee.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges:

TUTTLE, Circuit Judge:

The sole issue in this refund suit is whether the district court correctly held that taxpayer Jim Walter Corporation could not deduct as an ordinary and necessary business expense under section 162 of the Internal Revenue Code the net amount of $750,120 paid to purchase 188,000 outstanding FR B Warrants in June, 1959.[1]   The disallowance of this

1.  Section 162, 26 U.S.C. § 162, provides in part:

"*Trade or business expenses*

(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business  . . ."

deduction required the taxpayer to pay an extra $390,065.21 in federal taxes for its taxable year ending August 31, 1959, plus payment of interest in the amount of $115,133.36, the total refund claim of the taxpayer being $505,198.59.

## I. FACTS

The facts of this case are not in dispute. Jim Walter Corporation (hereinafter Walter) was organized in 1955 to carry on the business of building shell homes formerly conducted by Walter Construction Company, a partnership. Over 90% of the shell homes sales were financed by the taxpayer for the purchasers. As a result the taxpayer corporation experienced a continuing need for capital. The rather unorthodox capitalization plan of Walter included, *inter alia*, 9% bonds and 370,000 B Warrants (250,000 to the former partners and 120,000 to purchasers of the portfolios) for consideration of $.01 per warrant.[2] One B Warrant entitled, *inter alia*, the owner at any time prior to December 31, 2000, upon payment of $80 to the corporation to receive one share of the common stock of Walter and two $25 9% subordinated and unsecured bonds, due December 31, 2000; after December 31, 2000, the owner was entitled upon tender of $30 to the corporation to receive three shares of common stock.[3] It was conceived that as financing was needed by Walter, the warrants would be exercised.

In 1957, the 250,000 B Warrants held by the former partners were modified and changed to FR (First Refusal) B Warrants at the suggestion of the underwriters in connection with a public offering of corporate securities in that year.[4] The 1957 underwriters and the

---

**2.** In exchange for the net assets of the partnership, Walter issued the following securities to the partners:

      25—$1000 7% Convertible Subordinated Bonds
      50—$1000 8% Subordinated Bonds
   12,500—$25 9% Subordinated Bonds due December 31, 2000
 187,500—Shares of Common Stock
  10,000—A Warrants
 240,000—A Warrants Options
 250,000—B Warrants

Investors, other than the partners, purchased portfolios of securities, each consisting of:

      1—$1000 7% Convertible Subordinated Bonds
      2—$1000 8% Subordinated Bonds
      1—$500 9% Subordinated Bonds due December 31, 2000
  100—Shares of Common Stock
  400—A Warrants
  400—B Warrants.

Each A Warrant entitled, *inter alia*, the owner at any time prior to December 31, 2000, upon payment of $40 to the corporation to receive one share of common stock and one $25 9% bond due December 31, 2000. Each A Warrant Option entitled, *inter alia*, the owner at any time prior to December 31, 2000, upon tender of $1.10 to the corporation to receive one A Warrant.

---

◆

---

3. Following a 3-for-1 stock split in 1958, the B Warrant holders were entitled to receive *three* shares of stock and two bonds under each warrant and the A Warrant holders were entitled to receive *three* shares of stock and one warrant bond under each warrant.

4. As part of the 1957 secondary distribution, the underwriters purchased 10,000 A Warrants and 40,000 A Warrant Options from the former partners at a gross profit to the former partners of $119,600. After having exercised the 40,000 A Warrant Options, the underwriters then exercised 50,000 A Warrants, paid $2,044,000 to the taxpayer corporation and received from the corporation $1,250,000 principal amount of 9% subordinated bonds and 150,000 shares of common stock. These securities were offered to the public by the underwriters.

taxpayer were concerned that the B Warrants, if exercised, would cause the corporation to issue a large number of shares of common stock and bonds, and would subject the corporation to potential interest payments of $840,000 annually or a total of $34,000,000 until December 31, 2000, the maturity date of the 9% bonds. Under the FR B Warrants the taxpayer corporation at its option had the following conversion choices: (1) upon receipt of $80 and the warrant, to issue three shares of common stock of Walter (after the 3-for-1 stock split in 1958) and two $25 9% subordinated bonds—same as the "original" option under the B Warrants; or (2) upon payment of $30 and the warrant, to issue three shares of common stock (after the 3-for-1 stock split in 1958)—the "stock only" option; or (3) to repurchase the warrant for $4 or $6 depending on corporate net earnings—the "repurchase" option.[5]

In 1959, there was a 3-for-1 split of the stock of Walter and thereafter, in 1959, there was another separate public offering of securities of Walter.[6] The 1959 underwriters, too, were concerned about the possibility that the FR B Warrants might be exercised, causing the issuance of substantial debt obligations—9 million dollars of 9% bonds, carrying a potential 34 million dollars in bond interest over the years until 2000.[7] Apparently the underwriters' concern was also directed at the prospect of issuing additional shares of common stock,

resulting in a serious dilution of shareholder equity and the effect on earnings per share (which also might have a bearing on future stock issuances). Therefore, in June, 1959, the taxpayer corporation repurchased 188,000 FR B Warrants held by the former partners for $4 per warrant or a total of $752,000.

On its federal income tax return for the taxable year ended August 31, 1959, the corporation claimed a deduction in the amount of $750,120, the net amount between the $752,000 repurchase payment and the $1,800 consideration it had received in 1955 upon issuance of the underlying B Warrants.

The stock under the June, 1959, underwriting was issued to the public at $34 per share, and the 9% bonds at 105% of their face amount. Walter asserted that it legally and morally could not permit the exercise of these FR B Warrants under the "original" stock/bond option or the "stock only" option, because that would have caused Walter to issue stocks to four primary stockholders at $10 per share when the stock had a market value of $34, which would have resulted in a breach of fiduciary duty by the insiders.

The 62,000 FR B Warrants which remained outstanding after June, 1959, were either transferred to Walter employees under a stock option or were called in by Walter for $4 or $6 each according to their terms.

5. Both the 120,000 B Warrants, which remained unmodified, and the 250,000 FR B Warrants could be recalled by Walter after December 31, 1960, but the warrant holders had 45 days after any call in which to exercise the warrant.

6. The 1959 offering was similar in many respects to the 1957 secondary distribution. The 1959 underwriters purchased from the former partners 50,000 A Warrant Options at a gross profit to the former partners of nearly $4,000,000. The underwriters then exercised the options and the resulting 50,000 A Warrants, paid $2,055,000 to the taxpayer corporation and received $1,250,000 principal amount of 9% subordinated bonds and 150,000 shares of common stock. These

securities were then offered by the underwriters to the public.

7. According to the government, Walter's position that the repurchase payment was incurred to avoid heavy fixed interest charges is inconsistent with its issuing a total of $2,500,000 in 9% bonds in the 1957 and 1959 offerings. The taxpayer counters that these bonds were issued pursuant to the exercise of A Warrants over which Walter had no right of first refusal as in the case of FR B Warrants. Also, the taxpayer argues that it is quite a different situation to issue $1,250,000 in 9% bonds in each to two years compared to issuing $9,400,000 in bonds at one time.

At the district court, the taxpayer corporation claimed it was entitled to an ordinary and necessary business expense deduction in the amount of $750,120, the net payment for the 188,000 FR B Warrants, because the 1959 repurchase originated with the 1957 conversion of B to FR B Warrants which clearly was implemented for the deductible business purpose of saving interest, or, because the payment was analogous to a deductible premium paid to repurchase a corporation's bonds. The government contended, and the district court agreed, that the origin of the warrant repurchase was the 1959 reformation of the corporation's capital structure and thus was capital in character, and that eliminating liability for long term high interest was simply the potential consequence upon the taxpayer's capital structure created in earlier years, and therefore, under United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963), the payment for the FR B Warrants was a nondeductible capital expenditure. Furthermore, the repurchase could not be construed as a redemption of indebtedness, and thus the bond premium deduction analogy was not controlling.

## II. ORIGIN AND CHARACTER OF THE DEDUCTION

The principle that deductibility depends on the origin and character of the claim was first set forth in United States v. Gilmore, *supra*, where the Supreme Court stated:

"[T]he origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal' and hence whether it is deductible or not . . . ." [8]

In *Gilmore*, the payment of legal fees in a divorce proceeding was held to have originated with the divorce, and thus

deemed personal in nature and nondeductible. Even though the fees arguably were incurred to protect the taxpayer's income producing assets, this was a potential consequence and was not controlling.

Proper application of the origin test asserts appellant taxpayer, would have been to find that the 1959 repurchase stemmed from the creation of the first refusal provisions of the FR B Warrants, which clearly were instituted for the deductible business purpose of saving interest, and that the collateral consequence of altering Walter's capital structure should not be controlling. It is urged that the legal barrier to issuing $34 stock at $10 per share to insiders precluded exercise of the "stock only" option thus requiring the taxpayer corporation to exercise the "repurchase" option to avoid the bond interest under the "original" stock/bond option. Walter does not contend that the 1957 modification and the 1959 repurchase of warrants should be treated as a single transaction, or that the 1959 payment related back to the 1957 modification, but only that since Walter had no real choice in 1959 because of the 1957 modification, the reasons for the earlier modification should control.

The appellant taxpayer argues that this analysis of the origin and character of the 1959 repurchase is correct for two reasons. First, the 1959 repurchase was not part and parcel of, but independent of, the 1959 offering. The FR B Warrants were not part of the securities being offered, nor was Walter itself issuing securities to the public. Even if the repurchase is considered a condition imposed by the underwriters, a condition of underwriting is not necessarily an underwriting expense or an expense of issuing stock. For example, if underwriters required the issuing corporation to lease buildings from stockholders to assure continuity of business, the lease payments, if reasonable would be deduct-

---

8. For a recent discussion of the origin test and its applicability to sections 162 and 212, see Estate of Meade v. C. I. R., 5th Cir., 489 F.2d 161 (1974).

ible and would not be treated as expenses of the offering. Walter, of course, benefitted from the public offering to the extent that it received proceeds from the conversion of the A Warrants, but Walter did not participate in the proceeds of the public offering. Repurchasing at this particular time of the offering, asserts the taxpayer, was only a matter of convenience to Walter as it was receiving proceeds from the exercise of the A Warrants with which to pay the $4 per warrant. The independence of the FR B Warrant repurchase is further evidenced by the fact that to the extent that the balance of the FR B Warrants were not converted under an employees' benefit plan, they were eventually called in and repurchased by Walter in 1961.

Secondly, and more persuasively, the appellant taxpayer urges that this analysis is consistent with this Court's application of the origin test in Five Star Manufacturing Corp. v. Commissioner, 355 F.2d 724 (5th Cir. 1966), and United States v. Smith, 418 F.2d 589 (5th Cir. 1969). These decisions, assert the taxpayer, set forth the principle that although expenses of recapitalizations or other capital structure changes are generally nondeductible capital expenses, such expenses which arise for a valid business purpose other than altering the capital structure are deductible under the origin test. In *Five Star*, this Court, in reversing the Tax Court, permitted the taxpayer corporation to deduct as an ordinary and necessary business expense the cost of acquiring the interest of a 50% stockholder. Two individuals each owned 50% of the stock of the company, which was in serious straits and near receivership. The presence of one of the individuals as a shareholder was preventing the company from entering into an agreement with an outsider which was necessary for the survival of the company. The company purchased all of that shareholder's stock at judicial sale, and claimed a section 162 deduction for the entire purchase price. This Court concluded, *supra* 355 F.2d at 727:

> "To be deductible as a business expense, the payment must be both ordinary and necessary. It seems unquestionable that the payment to Smith to terminate his interest in Five Star was a necessary expense. . . . It can scarcely be held that the payment to Smith was for the acquisition of a capital asset, but rather one which would permit Five Star again to use assets for income production by freeing its management from unwarranted fetters."

Appellant taxpayer also relied heavily on United States v. Smith, *supra*, where this Court remanded the case to the district court to determine whether the taxpayer corporation assumed a certain liability of the partnership in the acquisition of its operating assets, and if so, whether the later satisfaction of that liability was a deductible expense of a part of the cost of acquiring the operating assets. The district court had found that the taxpayer had paid the liability in order to save its business, and therefore the payment was a noncapital expenditure. The *Smith* court instructed the district court to focus not on the purpose and effect of the payment of the debt, but on the reasons for the initial assumption of the liability, and, to allow a deduction if the primary purpose for the assumption was other than the acquisition of assets.[9]

---

9. This Court stated in Smith v. United States, *supra* 418 F.2d at 596–597:

"The trial court's finding was in error because it focused on the payment rather than upon the obligation which gave rise to the payment. If, as found by the district court, the corporation assumed the contingent liability to Ritenour when it was incorporated, the district court will be required to determine why the obligation was assumed.

"The importance of this determination is self-evident. If the corporation at its inception assumed a contingent obligation to pay Ritenour, it is that assumption of liability which obligated the corporation and not any subsequent legitimate business purpose. In other words, the corporation

In conclusion, the appellant taxpayer asserts that *Five Star* and *Smith* stand for the broad principle that if an expense of recapitalization or other capital structure changes serves a business purpose other than the acquisition of property, it is deductible even though it may appear to be, or in fact is, a part of a capital transaction. A court should look not to simply the change in the capital structure, but instead to whether the payment was primarily for a business purpose other than the acquisition of a capital asset.

The government makes the following convincing and clarifying response to the appellant's contentions that the district court erroneously applied the *Gilmore* origin test of deductibility. While not explicitly stated, the court's discussion indicates that it found the *origin* of the $752,000 payment to have been in the retirement of outstanding stock warrants. It found the character of the payment from its relationship to a change in the corporation's capital structure. On the other hand, the court noted the potential *consequences* of the payment was to avoid possible interest expenses on bonds which may have been issued in the future under the warrants. As examined earlier, the origin and character of the payment, not its potential consequences on the fortunes of the taxpayer, is controlling under *Gilmore*.[10] Therefore, the repurchase origin, being in the 1959 offering, and not with the 1957 conversion, cloaked the repurchase with a capital character.

did not have to pay because of the unfavorable judgment or because its directors deemed payment advisable but rather the corporation paid because it assumed the obligation when it became incorporated. Consequently we think the purposes behind the assumption should be determinative as to the question of the nature of the expenditure. As the district court correctly stated, it is the substance rather than the legal form of the transaction which governs. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S. Ct. 249, 88 L.Ed. 171 (1943). Here the substance of the transaction is based on the nature of the assumption of the liability which obligated the corporation to make the expenditure in question.

"Since we are remanding the cause for a determination as to the existence of such an assumption, we deem it proper further to instruct the trial court that should it determine that such liability was in fact assumed, the court must proceed to determine the reasons motivating the assumption. *If this factual inquiry reveals a primary purpose other than acquisition of property, the court may properly allow a deduction to the corporation . . .*" (Emphasis supplied).

10. The district court's opinion stated:
". . . in this case it seems to me that the purchase of these warrants was to avoid a hazardous potential consequence, i. e., the payment of millions of dollars in bond interest until the year 2000. To avoid the potential consequences, the FR B Warrants were retired. This resulted in a reformation of the corporation's capital structure. Under the principles of Gilmore, the cost of retiring these FR B Warrants is not deductible. The evidence in this case is clear that at the time in question the corporation was prospering. There is no evidence that it was beset by undue competition or by internal struggles with reference to stock ownership or internal control. . . .

"In the instant case there can be no doubt but that, as to 250,000 B Warrants, their modification to 'FR' B Warrants in 1957 removed any potential period of dilution of stock or of heavy fixed interest charges upon tender of such a warrant for exercise. This, after the 1957 modification, no bonds at all had to be issued, and only if the corporation also refused to issue stock was the corporation obliged to repurchase a tendered 'FR' B Warrant for cash. Manifestly, the payment of cash for such a warrant only extinguished a right to the corporation's stock, and it could not be construed to constitute a redemption of indebtedness. Moreover, and apart from the foregoing, it is also crystal clear from the evidence that the actual repurchase of the 188,000 'FR' B Warrants by the corporation was not in any wise part of the prior 1957 modifications whereby the 'First Refusal' options came into being. Rather, the evidence is wholly undisputed that the repurchase in question, in June of 1959, was part and parcel of a public offering of corporate stock and bonds in June, 1959, and in fact was required by the underwriters as a condition thereof."

■■ This finding of a capital origin and character under *Gilmore* is supportable on two grounds—either one of which alone is sufficient to sustain the judgment of the district court. First, the district court's judgment is sustainable on the basis that, as the court found, the $752,000 payment to repurchase was required by the underwriters in connection with the 1959 public offering. Thus, the repurchase of the warrants was a recapitalization expense associated with the corporation's issuance of stocks and bonds. It has been uniformly held that expenses incurred in connection with the acquisition or issuance of corporate stock and other reorganization or recapitalization expenses ordinarily are nondeductible capital expenditures. United States v. Hilton Hotels, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); Woodward v. Commissioner, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); Estate of Meade v. C. I. R., 5th Cir., 489 F.2d 161 (1974); General Bankshares Corp. v. Commissioner, 326 F.2d 712 (8th Cir. 1964); Johnson v. Commissioner, 56 F.2d 58 (5th Cir. 1932). Although the taxpayer asserts the repurchase of the warrants was not part and parcel of the 1959 offering and that the requirement of buying the warrants was not imposed on the corporation but only the warrant holders, these contentions are not supported by the record, which indicates that the corporation agreed to this requirement and de-

termined prior to the public offering to repurchase the warrants at $4 each. Moreover, the prospectus for the 1959 offering indicates that the corporation's repurchase was an integral part of the transaction.[11]

Secondly, the capital nature of this transaction is supported by the fact that the repurchase payment could be construed to have extinguished only the corporation's obligations to issue stock under the warrants. Under the FR B Warrants the corporation had three options: (1) "original" stock/bond option; (2) "stock-only" option; and (3) "repurchase" option. Thus, the corporation was not obligated to issue bonds, and, only if it refused to issue stock, was it required to repurchase the warrants. Thus as the district court observed, *supra* at n. 10, the cash payment could be interpreted to have merely extinguished the holder's right to the corporation's stock. On this basis the $752,000 expenditure only resulted in an alteration of the corporation's capital structure by its extinguishment of stock rights. The previously cited decisions, which have held that expenses of recapitalizations or other changes in capital structures are nondeductible capital expenditures, again clearly apply.

■ The final fatal flaw in appellant's arguments is that *Five Star* and *Smith* simply do not establish that any type of primary business purpose will

---

11. The initial page of the prospectus for the 1959 underwriting sets forth the securities to be issued and then declares:

". . . (4) On the exercise by the Underwriters of the 50,000 'A' Warrant Options and the underlying 'A' Warrants at $41.10 each, before deducting expenses payable by the Corporation, estimated at $209,700, and before the purchase by the Corporation from the Selling Security Holders of 188,000 'B' Warrants at $4 each."

At page 10 the prospectus states:

"The Selling Security Holders have agreed to Surrender 188,000 'B' Warrants presently owned by them and the Corporation has determined to exercise its option of repurchasing such 'B' Warrants at $4 per Warrant; upon such repurchase the

Corporation will pay an aggregate of $752,000 to the Selling Security Holders for an aggregate gross profit to them of $750,120."

At page 12, the prospectus provides:

"The Selling Security Holders are hopeful that the public offering, combined with their agreement to surrender 188,000 'B' Warrants to the Corporation for repurchase by the Corporation at $4 per Warrant, will assist in maintaining a market for the securities of the Corporation and that other security holders may exercise their conversion privileges with respect to the 7% Convertible Subordinated Bonds or may exercise Warrants, with the result that the Corporation will secure additional working capital."

suffice to convert an otherwise nondeductible expense of recapitalization or other changes in capital structures into a deductible item. The expenditures in those two cases were made to save the corporation from dire and threatening consequences. The court in *Five Star* stressed the extraordinary factual situation which showed a business emergency. Similarly the district court in *Smith* found that the corporation paid the liability in order to save its business and therefore the payment was a noncapital expenditure. In the instant case no similar emergency business purpose was presented; in fact, the district court expressly pointed out that the corporation was prospering.[11a] We think the principle followed in the two cited cases should not be extended beyond the facts of the cases.

The recent decision of this Court in Estate of Meade v. C.I.R., 5th Cir., 489 F.2d 161 (1974),[12] analyzed the origin test at length and reemphasized the import of the decisions by the Supreme Court in Woodward v. C.I.R., *supra,* and its companion case, United States v. Hilton Hotels Corporation, *supra* which held that legal expenses in appraisal proceedings in connection with a purchase of a dissenting shareholders' stock that was required under local law were nondeductible capital expenditures arising out of the acquisition of a capital asset. *Estate of Meade* further analyzed the *Woodward* and *Hilton Hotels* holdings:

> "The primary purpose of their expenditures in the appraisal proceedings, taxpayers argued, related not to the acquisition of title, but to the price to be paid for the stock, and, therefore, their expenditures should not be characterized as acquisition costs.

> "In rejecting the taxpayers' claims in *Woodward* and *Hilton Hotels*, the Supreme Court found the primary purpose test inapplicable to the situations before it: 'A test based upon the taxpayer's "purpose" in undertaking or defending a particular piece of litigation would encourage resort to formalisms and artificial distinctions.' Woodward v. C.I.R., 397 U.S. at 577, 90 S.Ct. at 1306. Instead, the Court adopted the 'origin' test, choosing to consider the origin and character of the claim for which the expenditures were made. On the basis of that test, the Court held that the determination of a purchase price by litigation is clearly part of the process of acquisition and should be treated as part of the cost of the stock that the taxpayers acquired. In so holding, the Court noted that 'ancillary expenses incurred in acquiring or disposing of an asset are as much part of the cost of that asset as is the price paid for it.' Woodward v. C.I.R., 397 U.S. at 576, 90 S.Ct. at 1305."

Due to the recent rejection of a primary purpose test for determining deductibility of expenses incurred in acquisition of capital assets in *Estate of Meade,* we cannot accept appellant taxpayer's argument that *Five Star* and *Smith* set forth any broad principle that if an expense of recapitalization or other capital structure reformation serves a business purpose other than the acquisition of property it is deductible, even though it may appear to be or in fact is, a part of a capital transaction. Rather, we read *Smith* and *Five Star* as being limited to situations where a payment to purchase a capital asset, though capital in nature, is necessary to the taxpayer's survival. *See* H. and G. Industries, Inc. v. C.I.R., 3rd Cir., 495 F.2d 653 (1974).

---

11a. *See* note 9, *supra.*

12. *Estate of Meade* held that attorney's fees paid by stockholders of a liquidated corporation in connection with settlement of an antitrust treble damage claim of the corporation which had been distributed pro rata with its stock in liquidation were not deductible as ordinary and necessary business expenses or expenses for the production of income, but must be capitalized and offset against long-term capital gain realized by the stockholders from the settlement of the claim.

## III. BOND PREMIUMS: ANALOGOUS?

■ Appellant taxpayer contends that the repurchase payment for the warrants should be treated as a premium paid to repurchase debt obligations. Under Treas.Reg. § 1.61–12(c)(1), which was in effect during the taxable year in issue, a premium paid by a corporation to purchase its bonds at a price in excess of the face value or issuing price is a deductible expense.[12a]

Walter concedes that no bonds or debt obligations were repurchased, but only urges that the underlying principle of bonds premium deduction, i. e. to avoid future interest costs, should extend to stock warrants convertible into debt securities where the payment has the same purpose. It is urged that the payment of the modification and the subsequent repurchase of the FR B Warrants—to save on future interest payments—is identical to the purpose supporting the deductibility of bond premiums. How-ever, contrary to taxpayer's position, the warrant repurchase payment cannot be treated analogously to a deductible premium paid to repurchase outstanding bonds, convertible or not, or any other type of debt obligations, because the underlying premise of the bond premium deduction, i. e. to save future interest, is inapplicable where the corporation's payment did not cancel any bonds or any other type of debt obligation and where the district court found that the payment originated with the 1959 offering rather than the 1957 conversion. Under the first refusal provisions of the warrants the taxpayer corporation at its option could refuse to issue bonds. Therefore, it cannot be said that the 1959 warrant repurchase payment here cancelled any outstanding debt obligations.

The court cannot construe the regulation in such a fashion as suggested by taxpayer. The payment was not for a "purchase by a corporation of its bonds."

This is decisive.

The judgment is affirmed.

---

12a. Section 61(a)(12), 26 U.S.C. § 61(a)(12), states:

"*Gross income defined*

(a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\* \* \* \* \*

(12) Income from discharge of indebtedness; . . ."

Treas.Reg. § 1.61–12(c)(1), during the period in question provided:

"(c) Sale and purchase by corporation of its bonds.

(1) If bonds are issued by a corporation at their face value, the corporation realizes no gain no loss. If the corporation purchases any of such bonds at a price in excess of the issuing price of face value, the excess of the purchase price over the issuing price of face value is a deductible expense for the taxable year. If, however, the corporation purchases any of such bonds at a price less than the issuing price of face value, the excess of the issuing price or face value over the purchase price is income for the taxable year."

In 1968, Treas.Reg. § 1.61–12(c)(1) was amended by transferring all but the first sentence to regulations under section 163. As subsequently modified by the Tax Reform Act of 1969, provisions similar to the second sentence are now found in Treas.Reg. § 1.163–3(c) and –4(c).

Furthermore, Rev.Rul. 74–210, 1974 Int. Rev.Bull. No. 19, has announced that the Service has reconsidered its position with respect to the deductibility of premiums paid by a taxpayer on repurchase of its convertible notes, and will now allow such premiums to be deducted in pre-1969 cases, as long as taxpayers can show facts substantially similar to Roberts & Porter, Inc. v. Commissioner, 307 F.2d 745 (7th Cir. 1962); Southwest Grease & Oil Co. v. United States, 435 F.2d 675 (10th Cir. 1971), affirming 308 F.Supp. 107 (D.Kan. 1969) on the issue of deductibility; Head Ski Co. v. United States, 323 F.Supp. 1383 (D.Md.1971), which held that premiums paid in repurchasing convertible bonds were deductible even though they resulted in part in extinguishment of a right to an equity interest.