**RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 74–2146.

United States Court of Appeals, Fourth Circuit.

Argued April 10, 1975.

Decided Dec. 4, 1975.

Frank W. Hardy, Richmond, Va. (Williams, Mullen & Christian, Richmond, Va., on brief), for appellant.

John G. Manning, Atty., Tax Div., U. S. Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Gilbert E. Andrews, Elmer J. Kelsey, Attys., Tax Div., U. S. Dept. of Justice, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, ALDRICH *, Senior Circuit Judge, and MERHIGE,** District Judge.

HAYNSWORTH, Chief Judge:

The Railroad, issuer of old hybrid securities, sought certain income tax advantages bottomed upon the claim that the securities are bonds. While they have some of the attributes of bonds, they also have attributes of common stock. The Tax Court held that with respect to the transactions involved, the securities should be treated as equity capital. Since the transactions themselves were oriented to those features attributable to common stock, we affirm.

In the last half of the last century, Richmond, Fredericksburg & Potomac Railroad issued several series of hybrid securities which were called "Guaranteed Stock." They have no fixed maturity date, but the face value would become due and payable six months after a "guaranteed dividend" payment had been in default. Semi-annual payments of dividends at the rate of seven[1] percent per annum were guaranteed. The "guaranteed dividends" were payable regardless of earnings, and the payment of the face value and accrued "guaranteed dividends" was secured by deeds of trust which are now first liens upon the Railroad's property.

The securities also have important attributes of stock. They carry voting rights just as the common stock does, and, if the dividends on the common stock exceed the "guaranteed dividend" on the "Guaranteed Stock," the holders of the "Guaranteed Stock" participate in the earnings by receiving the same amount of dividends as the common stockholders. In dissolution, after the common stockholders had received the par value of their stock, the guaranteed stockholders shared ratably in the distribution of all remaining assets.

In 1962, 1963 and 1964 the Railroad repurchased some of its guaranteed stock at prices far in excess of the face value. On its income tax return, it took a deduction of the excess of the purchase price over par value as a bond repurchase premium. When the Commissioner disallowed this deduction and the Railroad filed its petition in the Tax Court, it also claimed a deduction for the excess dividends paid over the guaranteed dividend. In the first of those years, the "excess dividend" was almost twice as much as the guaranteed portion

* First Circuit Judge, Sitting by Designation.
** District Judge, Sitting by Designation.

1. A relatively small amount of this Guaranteed Stock carries a six percent guaranteed rate.

of the dividends; in the other two years it was more than twice as much.

The Tax Court, with four judges dissenting, held against the Railroad on both of its claims.

■ In *Helvering v. Richmond, F. & P. Co.,* 4th Cir., 90 F.2d 971, we held that the guaranteed portion of these dividends was deductible as interest payments on debt. We recognized that the securities had many of the attributes of common stock, but the guaranteed dividend was a characteristic of fixed obligations and not of equity capital. The taxpayer now contends that after having held that the securities were debt for the purpose of deciding the deductibility of the payment of the guaranteed dividends, they must be treated as debt for all purposes. With that, however, we cannot agree. The securities are hybrids, and whether in a given instance they must be treated as debt or equity depends upon the circumstances, particularly a discriminating look at the provisions of the securities most relevant to the immediate transaction.

After a four-for-one stock split in 1949, reducing the par value of each guaranteed share from $100 to $25, the dividend payments substantially exceeded the $1.50 guaranteed on the six percent stock and the $1.75 guaranteed on the seven percent stock. The dividends paid on each increased from $3 per share in 1950 to $6 per share in 1964. The dividend in 1962 and in 1963 on each was $5.50.

The average price per share which the Railroad paid for the guaranteed stock acquired in 1962, 1963 and 1964 was, respectively, approximately $112, $118, and $164. There was a market for the shares, but to get the quantity it wished, the Railroad paid something above the quoted market price. However, what it sought to deduct was the entire excess of the cost of acquisition above $25 per share, the par value.

■ Obviously a $25 bond, however well secured, will never sell for $164. The high cost of these shares, in large part, is necessarily a reflection of the fact that their owners participated in current earnings distributions with the expectation of continued participation as earnings and dividends increased. These are among the common stock attributes of these securities and not a consequence of their debt characteristics. The Tax Court seems clearly warranted in finding that the excess cost over $25 a share, at least in large part, was for purchase of stock and not of debt.

■ If some of the excess might be attributable to the debt features of the securities, the Railroad has not attempted an allocation. It contends that it should not be required to make such an allocation because at that time the rule in this circuit, since reversed by statute, 26 U.S.C.A. § 249, was that a premium paid upon reacquisition of a convertible bond was deductible without allocation. *Head Ski Co. v. United States,* 4th Cir., 454 F.2d 732; *Robertson & Porter, Inc. v. Commissioner,* 7th Cir., 307 F.2d 745. The subsequently adopted statute does require such an allocation so that a premium, to the extent that it is attributable to the presence of the conversion feature, is no longer deductible.

It seems to us that the analogy between these securities and convertible bonds is quite imperfect. The convertible bond is nonetheless a bond until converted. Its holder may enjoy the hope of future gains by conversion into stock of higher value, and if the price of the common stock rises high enough, the value of the conversion feature would be reflected in the market price of the bonds. Until conversion, however, the bond holder has no present right enjoyed by stockholders. He may not vote, his annual return is fixed, and he has no current participation in earnings distributions. In contrast, the owners of these securities enjoyed all of those rights. The high prices paid were a reflection not of the owner's right to convert into another security because the securities they held carried with them the current right of participation in

earnings distributions. They had the right to vote; indeed, they enjoyed all the rights of the common stockholders, though they had other rights as well. Since the high prices paid were attributable in large part to the security holders' present participation in current earnings distributions, we think the old rule allowing a deduction of the premium paid on reacquisition of convertible bonds inapplicable.

■ The claim that the Railroad should be allowed to deduct the "excess dividends" paid during the three years in question is also founded upon the contention that these securities are debts for all purposes. In the earlier case we held only that the guaranteed portion of the dividend was deductible as interest paid, but the excess portion of the dividend bears no resemblance to interest payments. Since we concluded that these hybrid securities may be treated either as debt or as equity, depending upon the circumstances, this contention of the taxpayer must fail.

■ Finally, the Railroad contends that even if these securities be regarded as equity in these circumstances, it was entitled to deduct the repurchase premium under 26 U.S.C.A. § 162 as "ordinary and necessary business expenses." It asserts that the repurchases facilitated its business by removing restrictions on the transferability of corporate property. If a repurchase premium can ever be deducted upon that theory, however, there must be a showing of dire necessity. *Jim Walter Corp. v. United States,* 5th Cir., 498 F.2d 631; *H. & G. Industries v. Commissioner,* 3rd Cir., 495 F.2d 653. The Railroad's claim does not approach that kind of necessity.

For these reasons, we affirm the decision of the Tax Court.

*Affirmed.*