**MARKHAM & BROWN, INC.,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

Nos. 80–2106 and 81–1023
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

June 25, 1981.

Gardere & Wynne, H. Martin Gibson, Joe B. Harrison, Gordon H. Rowe, Jr., Dallas, Tex., for plaintiff-appellant.

Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Sect., Richard Farber, Richard N. Bush, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before AINSWORTH, GARZA and SAM D. JOHNSON, Circuit Judges.

PER CURIAM:

The appellant, Markham & Brown, Inc. was of the opinion that its repurchase of stock was deductible as an ordinary and

necessary business expense under 26 U.S.C. § 162 and that its unilateral allocation of amounts for covenants not to compete could be amortized. The Internal Revenue Service thought otherwise and denied Markham & Brown's claims for refunds. The district court affirmed. Contending that the district court had erred both on the facts and on the law, Markham & Brown sought relief in this court. Markham & Brown's briefs and arguments are capital, but so were its expenditures, thus disallowing the deductions. The district court's holding is affirmed.

The partnership of Markham & Brown was formed in the early 1930's. The business of the partnership involved river-related construction work. In the 1950's, Markham died, and M. J. Mitchell, an oil producer and banker, acquired Markham's interest in the partnership. Mitchell was never involved in the operations of the company, but rather served as an investor. In 1961, the partnership became a corporation with the name of Missouri River Constructors, Inc. The stock was distributed among three men. Ralph Brown and Mitchell each owned identical amounts of stock while the third stockholder, Charles Connor, owned a slightly lower percentage. The name was later changed to Markham and Brown, Inc.

In 1966, a buy-sell agreement was signed by the three stockholders. One provision of the agreement allowed any stockholder to demand that his stock be purchased by the corporation or the other shareholders. If none of these purchased the stock, the corporation was required to liquidate and dissolve. Another provision contained a covenant not to compete for five years following the sale of stock by a stockholder. Apparently, the business relationship between Mitchell and Brown began to deteriorate as early as 1969. In 1971, Connor sold his shares to the corporation, which shares were converted to treasury stock. This gave Brown and Mitchell, the only remaining shareholders, an equal number of shares in the corporation. Their relationship clearly worsened after Connor's departure. Brown alleged that Mitchell refused to talk to him and that an intermediary was neces-

sary to communicate information between the two. Mitchell disagreed, stating that they continued to speak to each other. Mitchell was further under the impression that Brown, who was president of the corporation, was not doing an adequate job.

In 1972, an individual named Armstrong, who was executive vice-president of the corporation, resigned. Mitchell, believing that the company would be in serious trouble without the business acumen of Armstrong, demanded that his shares be purchased. The corporation agreed to purchase the stock but Mitchell did not agree with the appraisal of the value of the company. Mitchell filed suit on this matter, which eventually resulted in a settlement. The settlement agreement included a covenant not to compete clause which was more restrictive than the one found in the 1966 agreement. The second covenant not to compete clause forbade Mitchell from financing competitors of the corporation for five years. There was never any discussion concerning the allocation of any part of the purchase price as payment for the covenant not to compete.

The corporation realized a net operating loss in 1972 and carried this back to 1970 and 1971 and carried it forward to 1973 and 1974. It was around 1972 that the corporation's accountants noticed the covenant not to compete in the 1966 agreement. They believed that a certain amount of the purchase price of Connor's stock, as well as Mitchell's stock, should have been allocated to the covenant not to compete. Mitchell and Brown therefore allocated $60,000 out of the total purchase price to Connor of $600,000 as payment for the covenant not to compete. The corporation also allocated $155,000 out of a total purchase price to Mitchell of over $1,200,000 as payment for a covenant not to compete. Both these amounts were amortized pursuant to the federal tax laws. Additionally, the corporation deducted its payments to Mitchell as ordinary and necessary business expenses under 26 U.S.C. § 162. After disallowance of these deductions by the Internal Revenue Service, Markham and Brown filed two

complaints in federal court. The first complaint involved its tax returns of 1970 and 1971. The second complaint concerned the tax years of 1973 through 1975. After losing in the district court and filing its notices of appeal, this court consolidated the two cases.

■ Expenses incurred in connection with the acquisition of corporate stock are usually nondeductible capital expenditures. *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572, 575, 90 S.Ct. 1302, 1304, 25 L.Ed.2d 577, 581 (1970); *Jim Walter Corp. v. United States,* 498 F.2d 631, 638 (5th Cir. 1974). An exception to this rule is found in *Five Star Manufacturing Co. v. Commissioner of Internal Revenue*, 355 F.2d 724 (5th Cir. 1966). In that case, two individuals, Kincade and Smith, purchased a patent for Five Star and later were sued by the inventor of the patent for failure to pay royalties. The apparent troubles of Five Star were attributable to the actions of Smith. The inventor agreed that Five Star could continue to use the patent provided that Smith would not be involved. Since the inventor had attached two-thirds of Five Star's inventory, the company could not have continued unless Smith was bought out. Five Star, thus, purchased Smith's stock. The Fifth Circuit allowed Five Star to deduct the cost of the repurchase of Smith's stock as an ordinary and necessary business expense under 26 U.S.C. § 162. This court held that the repurchase of the stock, rather than amounting to a capital acquisition, permitted Five Star "to use assets for income production by freeing its management from unwarranted fetters." *Five Star Manufacturing Company,* 355 F.2d at 727.

In 1974, the Fifth Circuit retained the *Five Star* rule but limited it to its facts. In *Jim Walter Corporation v. United States,* 498 F.2d 631, 639 (5th Cir. 1974), this court held if the origin and character of the payment is found to be capital, the fact that it may serve another business purpose other than the acquisition of property cannot change it into a deductible expense. The court in *Jim Walter* specifically held that

the *Five Star* rule applied only in those cases where the expenditure is "made to save the corporation from dire and threatening consequences." *Id.* 498 F.2d at 639. *See also Richmond, Fredericksburg and Potomac Railroad Co. v. Commissioner of Internal Revenue*, 528 F.2d 917, 920 (4th Cir. 1975) ("If a repurchase premium can ever be deductible . . ., there must be a showing of dire necessity."); *Harder Services, Inc. v. Commissioner of Internal Revenue*, 67 T.C. 585, 596 (1976), *aff'd*, 77–2 U.S.Tax Cas. ¶ 9743 (2d Cir. 1977) (denying a deduction for a repurchase which was not dictated by outside forces and was not done in the face of a threat to corporate survival).

■ In the instant case, Markham and Brown contends that the very survival of the company depended upon the repurchase of Mitchell's stock. The district court did not discern such a threat, and neither do we. There was clearly a difference of opinion between Brown and Mitchell. The strain and disputes may very well have diverted Brown's complete attention from the business, as he alleges. Nonetheless, the record clearly shows that the company was not in danger of extinction. Officers of the company testified that the dispute between Brown and Mitchell did not affect their performance or their direction of the company.

Further, the requirement that the corporation repurchase Mitchell's stock in order to avoid liquidation was not required by some outside force as in *Five Star*, but was a part of the 1966 buy-sell agreement entered into by Brown, Connor and Mitchell. Mitchell's testimony further indicates that he had no desire to torpedo the company and, in fact, wanted it to continue. Mitchell's stock was not repurchased in an effort to save the company. Rather it was repurchased after Mitchell made his valid demand for such repurchase based upon his own fear that Brown could not competently run the company any longer.

Regardless of the accuracy of Mitchell's opinion of Brown, the facts in this case do not indicate that the repurchase was based upon survival reasons. Instead, it was

based upon a right that Mitchell possessed under the buy-sell agreement. Its only benefit to the company was that it removed some animosity that existed between the shareholders. We find that the repurchase had its origin in Markham and Brown's own 1966 buy-sell agreement and that the character of the repurchase was clearly capital. Markham and Brown was not in dire straits, and the reasoning of *Five Star* is inapplicable in this case.

 Markham and Brown also allocated certain portions of the repurchase prices to Connor and Mitchell as attributable to the covenants not to compete found in the 1966 and 1972 agreements. The law is clear that a repurchaser must prove that the parties mutually intended at the time of repurchase that some part of the lump sum be allocated to the seller's covenant not to compete. *Better Beverages, Inc. v. United States*, 619 F.2d 424, 430 (5th Cir. 1980). No mention was ever made of any monetary amount being allocated to the covenant not to compete of either Connor or Mitchell. The record shows that the inclusion of the covenant itself was important to Brown, but no mention of a price for that covenant was ever made.

In fact, the accountant for Markham and Brown stated that the decision to allocate certain amounts for the covenant not to compete was made years after the signing of the 1966 agreement. Markham and Brown's attorney conceded that the tax consequences of Mitchell's settlement agreement with Markham and Brown, which included the stricter covenant not to compete, were not considered until after the document was signed.

"[W]hen a taxpayer has failed to arrange his affairs so as to minimize his taxes, he cannot expect the court to do it for him *nunc pro tunc." Balthrope v. Commissioner of Internal Revenue*, 356 F.2d 28, 34 (5th Cir. 1966).

Markham and Brown's subjective arguments that the allocations were reasonable cannot overcome its failure to prove a mutual agreement at the time of sale. *Better Beverages, Inc.*, 619 F.2d at 430. After a complete review of the record, we find that the district court made no error in its findings of fact or in its conclusions of law.

AFFIRMED.