SOUTHERN BANCORPORATION, INC. and Subsidiaries; World Finance Corporation of Americus; Southern Bank and Trust Company; Colonial Loan and Finance of Albany; Belvedere Finance Company, Inc. of Anderson; World Finance Corporation of Palestine and World Finance Corporation of Texas City, Appellees,

v.

UNITED STATES of America, Appellant.

No. 83–1838.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 9, 1984.

Decided April 17, 1984.

Rehearing and Rehearing En Banc Denied May 30, 1984.

Farley P. Katz, Tax Div., Dept. of Justice, Washington, D.C. (Henry Dargan McMaster, U.S. Atty., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellant.

Robert H. Hishon, Atlanta, Ga. (M. Celeste Pickron, Bondurant, Miller, Hishon & Stephenson, Francis Marion, Anne S. Ellefson, Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S.C., on brief), for appellees.

---

Before MURNAGHAN and CHAPMAN, Circuit Judges, and PECK,* Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

The application of the Federal income tax laws may seem to some prosaic; nevertheless, the opportunities for ingenuity, even ingenuity approaching fraud, are many. Here we observe a failed effort, imaginative but unavailing, on a taxpayer's part.

The Southern Bank Corporation, Inc. together with its wholly-owned subsidiaries here involved (SBC) was one of several prospering financial institutions approached by the Federal Deposit Insurance Corporation (FDIC) to participate in a bailout for a competing financial giant, American Bank and Trust Company (American), which had fallen on evil days. The scheme envisaged to accomplish the desirable objective of avoiding a bank failure, with its inevitable disquieting consequences, invited bids for certain of the assets:

Assets to be Purchased by Assuming
Bank (All values approximate)

| | | |
|---|---|---|
| A. | Cash, cash items in process of collection, amounts due from Bank and securities (book values) | $ 41,000,000 |
| B. | Loans—All loans except loans adversely classified by FDIC and all loans other than installment loans held at Orangeburg and Columbia branches | $ 38,000,000 |
| C. | Fixed Assets | $ 2,700,000 |
| D. | Other Assets (Accounts receivable, income earned, prepaid expenses, etc.) | $ 1,500,000 |
| | TOTAL | $ 83,200,000 |

The loan portfolio did not include all loan items. There were certain exclusions, approximating $61,000,000, for those pieces in default or otherwise of questionable worth.

As assets covered by the sale were the sites of 29 branches of American, located in 20 different communities, to be transferred through assumption of leases or otherwise. With those assets would go along the opportunity to approach the employees of American theretofore working in those branches in order to continue the branches in business on a going-concern basis.

Also, the successful bidder, as a distinct part of the purchase price, was required to assume certain liabilities of American amounting to $136,000,000. The FDIC undertook to make up in cash the gap between assets and liabilities, after reduction by the amount offered by the successful bidder as a premium. As it turned out the liabilities assumed by SBC under its successful bid exceeded book value of the as-

---

* The Honorable John W. Peck, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit.

sets and the FDIC cash contribution by $5,560,000.[1]

The opportunities, formally at least, for valuing in order to compare the offers of the competing entities on a differing basis were, consequently, restricted to how much of the "price" would be assigned to the going-concern worth of the branches. That, in turn, would depend on the extent for a fit, *i.e.*, on how far assumption of a branch would open up a new marketing area for the successful bidder not already served by its existing facilities. Ten of the American branches were located in communities in which American alone had offered banking services. SBC had had no branches in any of the 20 communities in which the actively operating businesses acquired from American were located.

The best offer received by the FDIC and the one accepted in September 1974 came from SBC. The premium, as already indicated, amounted to $5,560,000.

In computing the bid to make, SBC tested an approach involving a premium calculated as approximately 5% of American's total deposits of $112,000,000. SBC used the method because the Crocker National Bank in San Francisco recently had successfully bid 5% of the deposits of a failed bank to acquire it from the FDIC. SBC looked to whether a transaction so structured would be profitable. SBC determined that amortizing the premium over 40 years (*i.e.*, $137,500 per year) would afford SBC an annual profit. On that basis the bid was firmed up and submitted.

It should be self-evident that computation of the premium by reference to the deposit base was but another way of expressing concern that the acquired former branches of American in which savings accounts and checking accounts were maintained by customers would continue to operate as part of SBC. It was the on-going use of that deposit base of $112,000,000, located in the 29 branches, as a source from which to make profitable loans which made the branches things of value to SBC. Hence, the value of the 29 branches, or, more especially, of the deposits of their customers, constituted a paramount consideration in SBC's calculation of the premium it would offer.[2]

When income tax time came around, SBC, aided and abetted by Peat, Marwick Mitchell & Co., reassigned values to the properties acquired, primarily to increase the values of the loan portfolio components by $4,993,940 [3] and to shrink the going-concern value, to $566,060 ($5,560,000—$4,993,940). Going-concern value was not an amortizable item.[4]

The techniques employed to achieve the upward reevaluation included classification of the installment loans as extremely high in quality, on the grounds that the FDIC

1. After post-closing adjustments, the exact amount of the difference was $5,535,412, calculated by showing the face amount of the loans as $40,974,953. In light of a stipulation by the parties, the earlier estimated figure of $5,560,000 was utilized throughout the trial.

2. The record is devoid of any basis for establishing an amortization rate applicable to the premium based on the expected life of the accounts involved. *Cf. Midlantic National Bank v. Commissioner*, 46 TCM 1464 (1983). SBC's complaint raised, as an alternative ground for relief, the issue of amortizing the deposit base. However, SBC did not pursue the issue at trial and prove its alternative allegations that it paid $4,202,361 for the deposit base, and that the deposit base had a useful life of less than ten years.

3. An intangible asset, such as a loan portfolio, can be amortized if the "intangible asset is known from experience or other factors to be of use in ... the production of income for only a limited period, the length of which can be estimated with reasonable accuracy." Treas.Reg. § 1.167(a)3. By reassigning the bulk of the premium to the loan portfolios (*i.e.*, $2,839,022 to the installment loan portfolio, which had a useful life of 20.91 months, and $2,154,918 to the commercial loan portfolio, which had a useful life of 4.38 years), American attempted to convert non-amortizable values to amortizable ones.

4. It has been long settled that goodwill is not amortizable. *See Dodge Brothers, Inc. v. United States*, 118 F.2d 95, 100 (4th Cir.1941). Going concern value, which is akin to goodwill, is also non-amortizable. *See Northern Natural Gas Co. v. United States*, 470 F.2d 1107 (8th Cir.1972), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973).

had purified the portfolio by eliminating bad loans and the further grounds that SBC was spared the expenses of putting the loans, one by one, on its books. As for commercial loans, a sampling approach was employed (the sample included, of a total of 5000 loans, 162 chosen at random, and all over $50,000 in amount). SBC concluded that all loans in the sample were "excellent" (43%), "good" (54%), or "average" (1.597%). None was rated "fair" or "poor". Premiums of 15% were assigned to "excellent loans" and 5% to "good" loans.

The consolidated SBC income tax return prepared for 1974 sought amortization of the $4,993,940 to the extent of $589,241. On that basis, and taking into account other deductions, SBC claimed a loss for 1974 and sought to carry it back to prior years. When the Internal Revenue Service balked, SBC paid the tax and sued for a refund in the United States District Court for the District of South Carolina. SBC has not only claimed the right to amortize the $4,993,940, but also has put forth the alternative contention that, of the $5,560,000 premium, $4,202,361 should be allocated to the acquired deposits, and that as "cheap money" [5] that deposit base was a valuable and amortizable asset.[6]

In the expected, and, regrettably, inevitable battle of experts, SBC had one to testify that both the upward revaluation of the loans and the assignment of value to the deposit base were reasonable. The Government adduced evidence to establish that the loans, in aggregate, were worth less, not more, than face, and furthermore that the premium was paid to obtain the going concern value of American's branch banks which was non-amortizable. *See* note 4 *supra.*

The district judge determined that, whatever the non-depreciable asset value allocable to the deposit base was, it did not exceed $566,060, and that otherwise the premium was properly allocated to the increased worth assigned by SBC to the loan portfolio. The district judge further determined that the reasonable life for depreciation had been made out, so that refunds of the contested taxes, together with applicable interest, should be paid.

Section 1012 of the Internal Revenue Code, 26 U.S.C. § 1012, provides that the basis of property shall be the cost of property. On the approach adopted by SBC, there was not an assignment of values to the various components of the deal. Thus, it is difficult to say what the costs of the loan portfolios were.

■ SBC's attempt to increase the bases of the loan portfolios is wholly *post hoc.* A purchaser must prove the purchase price, *i.e.,* the cost, at the time of sale. *See, e.g., Markham & Brown, Inc. v. United States,* 648 F.2d 1043, 1046 (5th Cir. 1981); *Better Beverages, Inc. v. United States,* 619 F.2d 424, 429–30, *reh'g denied,* 625 F.2d 1160 (5th Cir.1980). SBC introduced no evidence to prove that it intended to pay an enhanced value for the loan portfolios *at the time of sale.* The Fifth Circuit said in *Better Beverages:* "A taxpayer's failure of proof on this point may not be overcome by abstract arguments, not tethered to the fact of the transaction, as to what *might* have been a fair and equitable price of apportionment." 619 F.2d at 430 (emphasis in original).

It is evident that the sophistication to apply the techniques on which the refund claim rests would not have been available to any willing purchaser in the relatively short period from September 5 [7] to September 20, 1974. SBC did not, in any event, evaluate the quality of loans prior to purchasing them.

---

5. Namely, funds of depositors on which interest was not paid or was well below the rates at which loans by a bank could and, no doubt, would be made.

6. That alternative contention appears not to have been pursued at trial.

7. September 5, 1974 was the date on which other banking institutions were apprised that assets of American would be auctioned off. Additional information became available only on September 18, 1974, two days before submission of bids was to occur.

Even if we assume, *arguendo*, that the bases of the portfolios should be fair market value,[8] SBC's scheme does not pass muster. As SBC asserts:

> There is no better evidence of market value than the purchase price paid for an asset in the marketplace in a transaction involving parties acting at arms length.

Here the burden of proof rested on SBC, the plaintiff in the tax refund case. *See United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *see also Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (taxpayer carries burden of proving entitlement to a deduction). SBC did nothing to establish that a sale of the loan portfolios on the open market on the sale date, September 20, 1974, by a willing seller to a willing buyer would have yielded any greater sum than that assigned in the valuation formula mandated by the FDIC when it sought bids. There was not even introduced evidence to show that a sale of a loan portfolio all by itself, identical to or reasonably similar to that of American, ever had, or could have, taken place in a fashion producing a fair market value exceeding, or indeed even equalling the aggregate face value. It is entirely possible that any such attempted sale would have assumed distress characteristics in the minds of purchasers, making the likelihood great that fair market value for such a commodity would be substantially depreciated from face value.

Manifestly, on the other hand, the achieving of ownership of branches of the former owner, American, on an on-going-business basis had a substantial value. The banking customers used to doing business in a certain location were to be expected to return to the location, despite the change in name reflecting a change in ownership. Especially is that the case when it is borne in mind that the take-over occurred during a weekend,[9] so that there was no interruption of continuity in the conduct of banking business in each of the branches formerly owned and operated by American. The Governor of South Carolina employed techniques assured of ample publicity to emphasize the continued safety of the deposits in the twenty-nine branches taken over by SBC.

In short, SBC's case is comprised exclusively of imagination and speculation. It is insufficient to overcome the presumption of correctness attaching to the acceptance by the IRS of the computations made in a manner conforming to the structure, and especially the assigned market values, of the transaction between FDIC and SBC. *Cf. Compton v. United States*, 334 F.2d 212, 216 (4th Cir.1964) ("It is a well established principle that in every case, whether in a proceeding in a Tax Court to contest a deficiency assessment or in a District Court in a suit for refund, the assessment of the Commissioner is presumed to be correct."). Since the burden of proof has not been met by SBC, it cannot prevail.[10] The judgment of the district court is reversed and the case remanded with instructions to enter judgment in favor of the Commissioner of Internal Revenue.

### REVERSED AND REMANDED.

---

8. Both the Commissioner and SBC assume that fair market value is relevant to the determination of the portfolios' bases. But fair market value has not been sufficiently established by SBC. We note that the Tax Court has said: "Where the issue is to determine the cost basis of an aggregate of assets, including both depreciable and nondepreciable items, it is essential to ascertain the fair market value of the items which are subject to depreciation." *Concord Control, Inc. v. Commissioner*, 78 T.C. 742, 750–51 (1982), *quoting Philadelphia Steel & Iron Corp. v. Commissioner*, T.C. Memo. 1964–93, *aff'd per curiam*, 344 F.2d 964 (3d Cir.1965).

9. The SBC bid was submitted on Friday, September 20, 1974, the day that American closed its doors. On Monday, September 23, 1974, SBC was open for business in all 29 former branches of American.

Thereafter, 3 of the branches were closed by SBC, but the other 26 continued to operate as SBC entities for at least the more than 8 years between September 23, 1974 and the trial on April 25 and 26, 1983.

10. Reliance by SBC on *Commissioner of Internal Revenue v. Seaboard Finance Co.*, 367 F.2d 646 (9th Cir.1966) is misplaced. Substantively it involved acquisition of small loan companies. For them, of course, interest rates for loans were permissibly much greater than for loans of the types in the American portfolio.