BANC ONE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10756–80.    Filed March 28, 1985.

*Charles J. Kegler, Paul D. Ritter, Jr.,* and *Edward C. Hertenstein,* for the petitioner.
*Eugene P. Bogner,* for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in petitioner's income tax liability of $455,263 for the tax year ended 1974 and $967,265 for the tax year ended 1975. The issues for decision are as follows: (1) Whether petitioner should be allowed depreciation deductions under section 167[1] with respect to either loan or deposit premiums allegedly acquired in the purchase of two banks, and (2) whether petitioner properly allocated the aggregate purchase prices of the two banks among the individual assets acquired in proportion to the relative values of the assets as determined by petitioner (the "second tier" allocations).

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Prior to October 19, 1979, petitioner was known as First Banc Group of Ohio, Inc. Petitioner and its predecessor shall hereinafter collectively be referred to as "petitioner."

Petitioner is a corporation and had its principal place of business in Columbus, Ohio, at the time of filing the petition herein. Petitioner and its subsidiaries filed consolidated Federal income tax returns for the calendar years 1974 and 1975 with the Internal Revenue Service Center in Cincinnati, Ohio.

Petitioner was a registered bank holding company under the Bank Holding Act of 1956 and owned substantially all of the shares of a number of commercial banks in Ohio. Through its subsidiaries, petitioner acquired additional Ohio banks. This case concerns the acquisition of the Athens National Bank (Old Athens) and the First Citizens Bank (First Citizens).

### Old Athens

Prior to September 13, 1974, Old Athens operated a main office facility and four branch offices in or near Athens, Ohio. Athens was the county seat of Athens County, a rural county in southeastern Ohio and the home of Ohio University. As of December 31, 1973, Old Athens was the largest of eight banks doing business in Athens County. Old Athens had deposits of $40.3 million, and the next largest bank had deposits of $15 million on that date. The other six banks in Athens County had aggregate deposits of approximately $48 million on December 31, 1973.

Prior to September 13, 1974, all of the shares of Old Athens were owned by United Dairy Farmers Investment Co. (United Dairy), a partnership whose principal office was in Cincinnati, Ohio, and whose principal partners were Carl H. Lindner (Lindner) and Robert D. Lindner. The board of directors of Old Athens consisted of its president, Brandon Tad Grover (Grover), and four Cincinnati residents, including Lindner, who were affiliated with United Dairy. Employed by Old Athens since 1952 and named president in 1965, Grover was the bank's sole executive-level manager, and he worked under the

close and continuing direction of the Cincinnati board members and owners.

Old Athens derived virtually all of its deposits from within Athens County. Grover, who was a member of the Athens City Council and an active participant in a variety of community-oriented activities, had acquired the deposit accounts of the majority of the businesses in Athens County.

The Cincinnati owners required Old Athens to enter into a number of loans and leases with customers from the Cincinnati area. Because Old Athens placed priority upon servicing the lending, leasing, and other banking requirements of the Cincinnati customers, the bank frequently refused or curtailed banking services to existing and prospective local customers.

Although Grover had no concern for the credit worthiness of the Cincinnati customers, he resented being forced by the owners to engage in the transactions. Grover believed that Old Athens could make additional and very profitable loans to customers in Athens County, if funds were not used in the Cincinnati loans and leases. Grover thus desired the acquisition of Old Athens by a holding company that would allow him to run a community-oriented bank on an aggressive and profitable basis.

In early 1973, Lindner contacted petitioner's chief executive officer and proposed the sale of Old Athens to petitioner. An associate of Lindner visited petitioner's office in Columbus, Ohio, in late summer of 1973 to discuss further the possible acquisition. Lindner's representative proposed a sales price of $13 million for Old Athens.

Sometime before October 11, 1973, petitioner reached an oral agreement in principle with Lindner for the purchase of Old Athens. On that date, several officers of petitioner met with Grover at Old Athens' offices. Petitioner's officers thereafter acquired additional information concerning Old Athens that became the basis of several written internal evaluations of the proposed transaction. These evaluations included a memorandum of October 12, 1973, prepared by petitioner's officer in charge of acquisitions, which described Old Athens' market, organizational and operational structure, and assets and liabilities, including loans and deposits.

During October and November of 1973, petitioner's assistant treasurer prepared several reports analyzing the financial

effect upon petitioner of the acquisition of Old Athens and determining petitioner's return on investment at various assumed acquisition prices. A primary objective of these reports was to ensure that the acquisition of Old Athens would not dilute petitioner's per-share earnings. The accuracy of the financial projections thus depended upon the assistant treasurer's ability to determine Old Athens' "normalized" net income, i.e., the expected continuing earnings of Old Athens based upon petitioner's accounting standards. In computing Old Athens' normalized earnings, petitioner's assistant treasurer considered Old Athens' loans and deposits and treated the excess of the assumed purchase prices over Old Athens' book value as "goodwill," to be amortized over 40 years.

On March 20, 1974, the F.B.G. National Bank of Athens (F.B.G.) was organized as a national banking association in which petitioner owned substantially all the shares. Old Athens, United Dairy, F.B.G., and petitioner entered into a merger agreement dated May 17, 1974, providing for the merger of Old Athens into F.B.G. The merged entity was to be renamed "The Athens National Bank" (New Athens). New Athens was to pay $10 million to the shareholders of Old Athens and to assume all of Old Athens' liabilities on the effective date of the merger. The merger agreement did not allocate the purchase price among the various assets to be acquired as a result of the merger. United Dairy agreed not to employ Grover in any capacity within 5 years after the effective date.

The obligations of petitioner (and thus of New Athens) under the agreement were subject to a number of express conditions. Among these was that there be no material adverse change in the financial position, business, or aggregate net assets of Old Athens from June 30, 1973, until the effective date of the merger. The purpose of this condition was to allow petitioner to avoid closing the transaction, if the financial condition of Old Athens at closing were materially worse than petitioner's expectations. Additionally, petitioner's obligations were contingent upon the payment in full, prior to the effective date, of the loans made by Old Athens to the Cincinnati borrowers.

On May 24, 1974, petitioner filed with the Comptroller of the Currency an application for approval to merge Old Athens

into F.B.G. Petitioner noted in the application that a condition precedent to consummation of the merger was that Old Athens' loans to Cincinnati customers, which aggregated approximately $5.13 million, be paid in full. Petitioner also stated that Old Athens held approximately $3 million in leveraged leases and equipment leases derived from transactions originated by the Cincinnati owners. Although these leases were to remain with New Athens after the merger, petitioner represented that New Athens would not participate in additional leveraged leasing and would engage in equipment leasing only to accommodate customers from the Athens area. According to petitioner, freeing New Athens from the credit and leasing requirements of the Cincinnati customers would allow the bank to satisfy better those needs of its local customers.

Between May 17, 1974, and September 13, 1974, petitioner sent auditors to Old Athens to perform a cursory review of the deposits, loans, and operations of the bank. Sometime after May 24, 1974, petitioner performed a preclosing examination of Old Athens. No change in the merger agreement resulted from petitioner's examinations.

The merger was consummated on September 13, 1974, at which time New Athens paid $10 million in cash and assumed all of Old Athens' liabilities (including investment tax credit recapture) totaling $39,266,812, for a total consideration of $49,266,812.

New Athens accounted for the merger under the "purchase" method for financial accounting purposes. New Athens thus attempted to record the assets transferred from Old Athens at their estimated fair market values. By this process, New Athens reduced the aggregate carrying value of the various loan portfolios (commercial, real estate, etc.) as reflected in Old Athens' financial records by $389,000. The stated purpose for this reduction was "to adjust the interest rates on loans to current rates charged by the bank." The average yields on the loan portfolios acquired from Old Athens generally were lower than the prevailing market rates at the time of the merger.

After restating each asset account to reflect its estimated fair market value, New Athens assigned the amount by which the purchase price exceeded the sum of the restated asset accounts (net of the related expected tax benefit) to an account

entitled "cost in excess of fair market value." New Athens expensed this account as a current charge in preparing the financial statements required by banking regulatory authorities. In petitioner's 1974 and 1975 annual report to shareholders, however, the "cost in excess" account was reported as an "other asset," to be amortized over a period not to exceed 40 years.

Petitioner secured a ruling from the Internal Revenue Service dated December 31, 1974, that, for Federal income tax purposes, the merger constituted a purchase by New Athens of the assets of Old Athens, and New Athens' bases in the acquired assets equaled their cost. The ruling also stated that, assuming certain exceptions did not apply, Old Athens would not recognize gain or loss, and Old Athens' shareholders would be treated as receiving the $10 million cash in full payment in exchange for their shares.

Petitioner engaged the accounting firm of Coopers & Lybrand (Coopers) to determine New Athens' bases for Federal tax purposes in the assets acquired from Old Athens. Coopers' task thus was to allocate the $49,266,812 purchase price among such assets. Coopers' work began in February or March of 1974 and culminated in a report dated December 31, 1974. The stated objective of Coopers' report was "An allocation of the purchase price in proportion to the fair market value of the assets."

The allocation in Coopers' report consisted of a two-step process. Coopers first allocated to each asset the amount that Coopers determined to be the fair market value of the asset. Because Coopers determined the aggregate fair market value of the individual assets to be $46,168,774, $3,098,038 of the purchase price remained unallocated after this first step. In the second step, Coopers allocated the $3,098,038 among all the assets except cash and cash equivalents in proportion to the relative values determined in the first step.

Coopers' determinations of the fair market values of the various assets generally corresponded with the values utilized by New Athens for financial accounting purposes, with two exceptions herein relevant—loans and goodwill.

Coopers assigned values to the various loan portfolios through "loan spreading." On forms created for the spreading process, personnel at Old Athens listed for each loan by

portfolio the name of the borrower, the principal balance due (i.e., the book value from Old Athens' financial records), and a rating of A+, A, B, or C. Coopers and Old Athens personnel jointly determined the factors to be used in rating the loans. Although the factors varied somewhat depending on loan type, the basic criteria were the term, yield, and original amount of the loan, the likelihood of payment on the loan, and whether the borrower had deposits with or received other services from Old Athens. Grover reviewed the completed forms and transferred them to Coopers. Coopers then determined a premium or discount percentage to be applied to the balance due on each loan depending upon the loan's rating. Coopers valued the loans rated A+ at a 20-percent premium over the balance due, the A loans at a 10-percent premium, the B loans equal to the balance due, and the C loans at a 10-percent discount from the balance due. The net effect of these adjustments was to increase the aggregate loan balance by $2,675,369 over the amount reported by Old Athens on the effective date of the merger.

Coopers also determined a value for "goodwill and other intangibles" during the first step in its allocation process. Coopers stated in its report that the value assigned to this account was computed in accordance with Rev. Rul. 68–609, 1968–2 C.B. 327.

From Old Athens' financial statements, Coopers ascertained the following income and capital figures:

| Year | Total operating income | Net earnings after tax and before security transactions | Yearend total capital plus reserves |
|---|---|---|---|
| 1973 | $3,356,597 | $693,330 | $4,558,936 |
| 1972 | 3,139,252 | 707,958 | 3,872,984 |
| 1971 | 2,631,559 | 561,484 | 2,991,836 |
| 1970 | 2,278,540 | 521,712 | 2,699,590 |
| 1969 | 1,876,519 | 254,151 | 2,792,528 |
| Total | 13,282,467 | 2,738,635 | 16,915,874 |
| Average | 2,656,493 | 547,727 | 3,383,175 |

Based upon a comparison of Old Athens' commercial loan rates for the years 1969 through 1973 with the commercial rates of "three similar country banks," Coopers found Old Athens' rates to have been 1 to 2 percent higher during the period. Coopers concluded that the Cincinnati loans enabled

Old Athens to earn "a higher commercial loan rate than is customary for a country bank," and determined that Old Athens' loan income would probably have been an average of approximately $115,000 lower each year had the bank not engaged in the Cincinnati loans. Coopers further determined that Old Athens earned approximately $100,000 per year during 1971 through 1973 from the Cincinnati leases that it otherwise would not have earned. To reflect these determinations, Coopers restated the figures reported in Old Athens' financial statements as follows:

| Year | Adjusted total operating income | Adjusted net earnings after tax and before security transactions | Adjusted yearend total capital plus reserves |
|---|---|---|---|
| 1973 | $3,115,597 | $520,010 | $3,959,416 |
| 1972 | 2,909,252 | 540,358 | 3,446,784 |
| 1971 | 2,440,559 | 414,164 | 2,733,236 |
| 1970 | 2,180,540 | 470,752 | 2,588,310 |
| 1969 | 1,760,519 | 193,831 | 2,732,208 |
| Total | 12,406,467 | 2,139,115 | 15,459,954 |
| Average | 2,481,293 | 427,823 | 3,091,991 |

Based upon statistics from the Federal Reserve Bulletin for September 1974, Coopers determined that the normal rate of return (computed as net income after taxes and before security transactions divided by capital plus reserves) of banks of Old Athens' size and location was 11.95 percent. Multiplying Old Athens' average adjusted capital of $3,091,991 by the 11.95-percent rate, Coopers determined that a "normal return" for a bank like Old Athens was $369,493, and that Old Athens earned an average "excess return" of $58,330 each year (Old Athens' average adjusted net earnings of $427,823 less $369,493). Coopers then capitalized the average annual excess return figure at twice the 11.95-percent rate, to yield a value for the "goodwill and other intangibles" of Old Athens of $244,059.

The following table illustrates Coopers' allocation of the aggregate purchase price of Old Athens:

| Asset acquired | Book value per Old Athens | Increase or (Decrease) to FMV | FMV as determined by Coopers | Allocation of excess of cost over FMV | Tax basis |
|---|---|---|---|---|---|
| Cash | $5,088,735 | - - - | $5,088,735 | - - - | $5,088,735 |
| Federal funds sold | 700,000 | - - - | 700,000 | - - - | 700,000 |
| U.S. Government obligations | 9,414,272 | ($69,738) | 9,344,534 | $708,825 | 10,053,359 |
| Federal agency securities | 2,203,751 | (142,124) | 2,061,627 | 156,384 | 2,218,011 |
| Municipal bonds | 963,357 | (18,579) | 944,778 | 71,666 | 1,016,444 |
| Federal Reserve stock and other securities | 197,617 | (9,692) | 187,925 | 14,255 | 202,180 |
| Commercial loans | 4,414,644 | 680,135 | 5,094,779 | 386,463 | 5,481,242 |
| Real estate loans | 5,832,213 | 1,056,463 | 6,888,676 | 522,538 | 7,411,214 |
| Floor plan loans | 569,961 | 111,692 | 681,653 | 51,707 | 733,360 |
| Installment loans | 7,893,861 | 678,266 | 8,572,127 | 650,235 | 9,222,362 |
| Other installment loans | 1,151,538 | 148,813 | 1,300,351 | 98,638 | 1,398,989 |
| Other loans | 1,178,371 | - - - | 1,178,371 | 89,385 | 1,267,756 |
| Land | 109,394 | 20,856 | 130,250 | 9,880 | 140,130 |
| Building | 782,469 | 90,666 | 873,135 | 66,232 | 939,367 |
| Equipment | 342,570 | 55,003 | 397,573 | 30,158 | 427,731 |
| L/H improvements | 27,940 | (27,940 | - - - | - - - | - - - |
| Depreciation reserve | (153,784) | 153,784 | - - - | - - - | - - - |
| Interest earned, not collected | 388,626 | - - - | 388,626 | 29,479 | 418,105 |
| Prepaid expenses | 66,176 | - - - | 66,176 | 5,020 | 71,196 |
| Braniff lease | 1,237,415 | (533,603) | 703,812 | 77,344 | 781,156 |
| American lease | 666,166 | (341,050) | 325,116 | 35,728 | 360,844 |
| Sci Tek lease | 543,374 | 136,754 | 680,128 | 51,591 | 731,719 |
| Levinson lease | 213,003 | (34,826) | 178,177 | 13,516 | 191,693 |
| Other leases | 138,166 | - - - | 138,166 | 10,481 | 148,647 |
| Goodwill | - - - | 244,059 | 244,059 | 18,513 | 262,572 |
| | 43,969,835 | 2,198,939 | 46,168,774 | 3,098,038 | 49,266,812 |

The liabilities of Old Athens assumed by New Athens on the effective date of the merger included the following liabilities for deposits:

| Type | Amount |
|---|---|
| Demand deposits | $13,233,692 |
| Savings deposits | 6,659,401 |
| Due to other banks | 74,118 |
| Public funds | 4,894,003 |
| Nonnegotiable certificates of deposit | 13,592,158 |

The demand deposits were non-interest-bearing checking accounts. The savings deposits included three types of savings plans: (1) Receipt savings accounts bearing interest subject to regulatory limits and requiring no minimum term or minimum balance; (2) moneytree accounts bearing interest subject to regulatory limits and requiring no minimum balance, but

requiring a 90-day minimum term; and (3) 3-month savings plans requiring a $1,000 minimum balance and a 90-day minimum term and bearing interest at an optional guaranteed rate for 5 years.

Public funds comprised approximately 18 percent of Old Athens' total deposits. These funds included accounts of various agencies of the United States, the State of Ohio, and the County and City of Athens.

Old Athens' deposit accounts varied substantially in size. A relatively small percentage of the depositors thus accounted for a relatively large percentage of the total deposits. For example, on June 30, 1972, 168 of 24,254 deposit accounts represented over $12.5 million of approximately $36.5 million in deposits.

Of the 69 employees of Old Athens on September 13, 1974, 68 were employed by New Athens after the merger, and 23 remained employed as of April 30, 1984. Although Grover did not enter into an employment contract with New Athens after the merger, as of the date of trial, he remained president without interruption.

New Athens continued to use the name "Athens National Bank" until it was renamed "Bank One of Athens N.A." on October 22, 1979.

The financial statements of Old Athens for the years 1971 through 1973 and New Athens for the years 1974 through 1976 reported the following amounts as "interest and fees on loans":

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1971 | $1,393,801 | 1974 | $2,098,990 |
| 1972 | 1,811,127 | 1975 | 2,005,000 |
| 1973 | 2,015,358 | 1976 | 2,289,000 |

### First Citizens

In July of 1970, First Citizens operated a single office in Oxford, Butler County, Ohio. First Citizens was the second smallest of seven banks operating 32 offices in Butler County.

Both the main campus of Miami University and that of Western College were located in Oxford, and more than half of Oxford's 1970 population of 15,868 were students at these institutions. Although Butler County contained two urban

industrial centers, the schools were the primary economic enterprises in Oxford. Oxford lacked transportational accessibility, and the community exerted little effort to attract additional businesses.

The Barnitz Bank (Barnitz) was a subsidiary of petitioner engaged in banking in the Butler County city of Middletown. In July of 1970, the president of Barnitz and the president of First Citizens began discussing a stock merger of First Citizens into Barnitz. Allen Welsh (Welsh), First Citizens' president, wished to retire and believed that First Citizens lacked successor management and therefore could not continue to operate as an independent bank. After First Citizens' loan portfolio developed problems and received increased regulatory scrutiny, Welsh resumed discussions with Barnitz' president in February of 1971. The discussions continued until June 1972, when Welsh and the president of Barnitz agreed that Barnitz would submit an offer to First Citizens' board of directors in August or September of that year. Before Barnitz could present the offer, however, Welsh died in the fall of 1972.

Following Welsh's death, Don Teetzel (Teetzel) became president of First Citizens, even though, by his own appraisal, Teetzel lacked the capacity and interest for the position. Teetzel spent substantially all of his term as president in the hospital and died in March of 1973.

The board of directors of First Citizens recognized during this time that the bank confronted problems that necessitated an acquisition by a larger bank. In addition to the deaths of Welsh and Teetzel, First Citizens suffered from the failure to adhere to sound credit policies and a highly congested office facility that lacked parking and both drive-in and after-hours banking. First Citizens' most immediate operating concern became effecting recoveries on a large number of problem loans. The board members therefore continued the negotiations with Barnitz and initiated negotiations with four additional banks.

Several of First Citizens' directors also attempted to arrange a syndicate of local investors to purchase the stock of any shareholders wishing to receive cash. Although the attempt was unsuccessful, the board learned that substantially all of the shareholders desired cash instead of an exchange of shares.

In March of 1973, Barnitz and three other banks submitted cash bids for the purchase of First Citizens. Barnitz' bid substantially exceeded each bid of the other banks.

Barnitz and First Citizens executed a purchase agreement dated May 1, 1973, in which Barnitz agreed to purchase all the assets of First Citizens in exchange for cash and the assumption of all of First Citizens' liabilities. The amount of cash payable on the closing date was $1,576,935, plus an additional amount based upon the recovery of certain loans, but in no event to exceed $1,825,005. The purchase agreement did not allocate the purchase price among the assets to be acquired by Barnitz. First Citizens agreed to adopt a plan of complete liquidation after closing.

The asset purchase was consummated on December 31, 1973, and on that date Barnitz paid First Citizens $1,620,510 in cash and assumed liabilities of $9,821,474, for a total purchase price of $11,441,984.

For financial accounting purposes, Barnitz attempted to restate the asset accounts as carried on First Citizens' books to reflect market values. Barnitz made no adjustments to the loan accounts during this process. Barnitz allocated the amount by which the purchase price exceeded the sum of the restated asset accounts (net of expected tax benefit) to "cost in excess of fair market value." This amount was expensed in Barnitz' financial statements pursuant to regulatory requirements but reported in petitioner's financial statements as an "other asset," to be amortized over a period not to exceed 40 years.

Petitioner engaged Coopers to determine Barnitz' bases for Federal tax purposes in the assets acquired from First Citizens. Coopers employed a two-step process similar to that utilized in connection with the Old Athens transaction. In allocating a portion of the purchase price to each asset equal to its estimated market value (the first step of the process), Coopers recognized three assets not carried on the books of First Citizens or recorded by Barnitz for financial accounting purposes. These assets were "bank charter," "trade name," and "going concern value," to which Coopers allocated $1,035, $25,000, and $40,000, respectively. Coopers made no allocation to loan premiums or goodwill. Coopers concluded that First Citizens possessed no goodwill in part because Coopers deter-

mined the bank's earnings to be below the average for similar banks.

After the first step of the process, the purchase price exceeded the restated asset accounts by $634,972. In the second step, Coopers allocated this amount among all assets except cash and cash equivalents in proportion to their relative values as determined in the first step.

The following table illustrates Coopers' allocation of the aggregate purchase price of First Citizens:

| Asset acquired | Book value per First Citizens | Increase or (decrease) to FMV | FMV as determined by Coopers | Allocation of excess of cost over FMV | Tax basis |
|---|---|---|---|---|---|
| Federal income tax refund | $14,078 | ($12,877) | $1,201 | - - - | $1,201 |
| Cash and due from banks | 1,886,810 | - - - | 1,886,810 | - - - | 1,886,810 |
| U.S. bonds and obligations | 458,017 | 1,976 | 459,993 | $48,639 | 508,632 |
| U.S. agencies | 200,250 | - - - | 200,250 | 21,145 | 221,395 |
| Municipals | 1,184,009 | 16,244 | 1,200,253 | 126,867 | 1,327,120 |
| Federal funds sold | 2,900,000 | - - - | 2,900,000 | - - - | 2,900,000 |
| Commercial loans | 2,980,277 | - - - | 2,980,277 | 315,010 | 3,295,287 |
| Mortgage loans— conventional | 101,907 | - - - | 85,000 | 8,953 | 93,953 |
| Mortgage loans—FHA | | - - - | 16,907 | 1,778 | 18,685 |
| Installment loans | 725,020 | - - - | 725,020 | 76,641 | 801,661 |
| Land | | | 30,000 | 3,175 | 33,175 |
| Buildings | 81,125 | 104,775 | 110,000 | 11,620 | 121,620 |
| Furniture and fixtures | | | 45,900 | 4,826 | 50,726 |
| Accrued loan interest | 65,667 | - - - | 65,667 | 6,921 | 72,588 |
| Purchase interest | | - - - | 10,397 | 1,079 | 11,476 |
| Accrued bond interest | 21,773 | - - - | 11,376 | 1,143 | 12,519 |
| Series E bonds redeemed | 11,926 | - - - | 10,959 | - - - | 10,959 |
| Prepaid insurance | | - - - | 967 | 127 | 1,094 |
| Bank charter | - - - | 1,035 | 1,035 | 127 | 1,162 |
| Trade name | - - - | 25,000 | 25,000 | 2,667 | 27,667 |
| Going-concern value | - - - | 40,000 | 40,000 | 4,254 | 44,254 |
| | 10,630,859 | 176,153 | 10,807,012 | 634,972 | 11,441,984 |

The liabilities of First Citizens assumed by Barnitz on the effective date of the acquisition included the following liabilities for deposits:

| Type | Amount |
|---|---|
| Demand deposits | $5,787,309 |
| U.S. Government deposits (demand) | 231,495 |
| Savings accounts | 3,703,118 |
| Nonnegotiable certificates of deposit | 48,500 |

The demand deposits were non-interest-bearing checking accounts. The Government deposits were generally noninterest-bearing Treasury tax and loan deposits. The savings accounts included passbook accounts bearing interest subject to regulatory limits and requiring no minimum term or minimum balance, and savings plus accounts bearing interest subject to regulatory limits and requiring a minimum term of 90 days and a minimum balance of $1,000.

On the effective date of the acquisition, First Citizens became a branch of Barnitz, doing business as the "First Citizens' Branch of the Barnitz Bank." On October 22, 1979, Barnitz' name was changed to "Bank One of Middletown."

Of the 12 employees of First Citizens on December 31, 1973, 11 were employed by Barnitz after the acquisition, and 5 remained employed as of April 30, 1984.

First Citizens realized "operating income" before the acquisition as follows:

| Year | Amount |
|------|--------|
| 1972 | $119,900 |
| 1971 | 111,800 |
| 1970 | 121,500 |
| 1969 | 160,800 |
| 1968 | 76,700 |

### Additional Facts Relating to Depreciation

On its income tax returns for the years in issue, petitioner reported depreciation deductions with respect to certain assets acquired from Old Athens and First Citizens. Petitioner used the amounts assigned by Coopers to the various assets in the purchase price allocations as its bases for depreciation of the assets.

In the statutory notice of deficiency, dated April 1, 1980, respondent determined that the excess of the purchase prices of Old Athens and First Citizens over the pre-existing book values of the acquired assets represented goodwill and other intangibles. Respondent disallowed petitioner's deductions for the years 1974 and 1975 to the extent that the deductions were based upon costs in excess of such book values.

In its petition filed with the Court on June 20, 1980, petitioner relied on the process used by Coopers to support its bases in the assets acquired from Old Athens and First

Citizens. On April 23, 1984, petitioner filed amendments to the petition in which it alleged in the alternative that it acquired from Old Athens and First Citizens a "deposit premium," which was a depreciable intangible asset.

Core deposits are the checking and savings deposits of a commercial bank and represent the primary resource with which the bank earns profit. The bank typically invests the funds from deposits in loans and other income-producing assets and receives fees for services rendered to its depositors. The bank also incurs various expenses in establishing, processing, and maintaining the deposit accounts. The excess of the income generated by savings and checking account funds over the associated costs of those accounts represents the profit attributable to the core deposits. Thus the economic value of core deposits rests upon their ability to generate a stream of earnings over time. Often the assumption of the deposit liabilities, rather than the purchase of the assets, represents the economic purpose behind the acquisition of a bank.

Deposit accounts do not remain permanently with a bank, but close for a variety of reasons. For individual accounts, these reasons include the death, marriage, and divorce of the depositors. For business accounts, the reasons include the reorganization and bankruptcy of the depositors. Both individual and business accounts may terminate because of the relocation of the depositors and the acquisition of the accounts by a competing bank. It is not possible to predict accurately when a particular deposit account will leave a bank. Statistical analysis can be utilized, however, to estimate the percentage of accounts in the total deposit base that will close over a given period of time.

In December of 1981, petitioner engaged Patten, McCarthy & Associates, Inc. (PM), a bank consulting firm, to prepare statistical reports analyzing the core deposits acquired from Old Athens and First Citizens. The reports were dated March 12, 1984, with respect to Old Athens, and March 22, 1984, with respect to First Citizens. In the reports, PM valued the total core deposits acquired from Old Athens at $3,009,909, and from First Citizens, at $1,434,797, as of the respective acquisition dates.

The PM reports also contained "amortization schedules" for the acquired core deposits. To prepare the amortization sched-

ules, PM first selected sample accounts from the account records as of the end of each year for 5 consecutive years. With respect to First Citizens, PM chose the sample accounts from the account records as of the end of the years 1973 through 1977. In implementing a computer accounting system in 1976, New Athens changed the identification numbers of its deposit accounts. PM therefore selected the samples from New Athens' account records as of the end of the years 1976 through 1980. The statistical accuracy of both reports was "conditional on the sample of accounts selected."

After grouping the sample accounts for each year by age (i.e., the length of time the account had been with the bank), PM followed each sample account throughout the 4-year sample period to determine whether and when the account closed during the period. From this information, PM estimated the rates at which the acquired core deposits would close over time. PM then applied these rates to the values it determined for the core deposits to compute the amount of amortization each year after the acquisition. The amortization period for Old Athens extended for 21 years with respect to checking accounts, and 11 years with respect to savings accounts. The period for First Citizens extended for 40 years with respect to checking accounts, and 20 years with respect to savings accounts. Because the account termination rates calculated by PM were highest during the early years, the amortization schedules resulted in 60 percent of the core deposit value (as determined by PM) of Old Athens, and 51 percent of that of First Citizens being amortized during the first 3 years after the acquisition.

## OPINION

### *Issue 1: Depreciation of Loan or Deposit Premiums*

Through its subsidiaries, petitioner purchased two operating banks at prices exceeding the book values reported in the financial records of the acquired banks. Petitioner contends that a portion of the excess purchase price of Old Athens should be allocated either to a "loan premium" or to a "core deposit intangible," both of which petitioner argues are depreciable intangible assets. Petitioner raises only the core deposit argument with respect to the acquisition of First Citizens.

Respondent asserts that the amounts attributed by petitioner to depreciable intangibles should, instead, be allocated to goodwill, going concern value, or some other nondepreciable asset.

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or held for the production of income. Section 1:167(a)-3, Income Tax Regs., provides for the depreciation of certain intangible property:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

To qualify for a depreciation deduction with respect to an intangible asset, petitioner thus must prove that the asset (1) had an ascertainable cost basis separate from goodwill and going concern value and (2) had a useful life, the duration of which could be ascertained with reasonable accuracy. *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240 (5th Cir. 1973); *L.A. Central Animal Hospital v. Commissioner*, 68 T.C. 269 (1977). Whether petitioner has satisfied these requirements is essentially a factual question. *Computing & Software, Inc. v. Commissioner*, 64 T.C. 223 (1975).

Respondent first argues that under *Southern Bancorporation v. United States*, 732 F.2d 374 (4th Cir. 1984), petitioner cannot use the analyses of Coopers and PM to establish its cost bases in the loan premium and the core deposit intangibles because "the loan spreading process had no bearing on the determination of the purchase price and was not included in the negotiations toward the purchase price between the buyer and seller" and "There is no evidence whatsoever that the two sellers involved in this case and the petitioner negotiated as to the value of this alleged core deposit premium." In *Southern Bancorporation*, the Fourth Circuit Court of Appeals declined to allow the purchaser of a bank to increase the bases of acquired loans pursuant to loan spreading.

Section 1012 of the Internal Revenue Code, 26 U.S.C. sec. 1012, provides that the basis of property shall be the cost of property. On the approach adopted by * * * [the taxpayer], there was not an assignment of values to the various components of the deal. Thus, it is difficult to say what the costs of the loan portfolios were.

* * * [The taxpayer's] attempt to increase the bases of the loan portfolios is wholly *post hoc*. A purchaser must prove the purchase price, i.e., the cost, at the time of sale. *See, e.g. Markham & Brown, Inc. v. United States*, 648 F.2d 1043, 1046 (5th Cir. 1981); *Better Beverages, Inc. v. United States*, 619 F.2d 424, 429–30 *reh'g denied*, 625 F.2d 1160 (5th Cir. 1980). * * * [The taxpayer] introduced no evidence to prove that it intended to pay an enhanced value for the loan portfolios *at the time of sale*. The Fifth Circuit said in *Better Beverages*: "A taxpayer's failure of proof on this point may not be overcome by abstract arguments, not tethered to the fact of the transaction, as to what *might* have been a fair and equitable price of apportionment." 619 F.2d at 430 (emphasis in original).

[*Southern Bancorporation v. United States*, 732 F.2d at 377.]

The Fourth Circuit in *Southern Bancorporation* did not hold that the purchaser of a business must evaluate separately, or assign a portion of the aggregate purchase price to, any of the individual assets at the time of acquisition. The language quoted above is merely the Fourth Circuit's initial step in holding that the taxpayer in the case before the court failed to prove that it paid an amount exceeding face value for the loans. Certainly an intention to pay, or the allocation of, a specific price for the loans at the time of the acquisition would be persuasive evidence to establish the taxpayer's basis. Finding such evidence absent, the court nevertheless considered whether the taxpayer had proved that the fair market value of the loans exceeded their face amounts on the date of purchase and concluded that the taxpayer had not met its burden of proof. *Southern Bancorporation v. United States*, 732 F.2d at 378.

We recognize that the Fourth Circuit prefaced its inquiry into market value with "Even if we assume, *arguendo*, that the bases of the portfolios should be fair market value" (732 F.2d at 378), and that the language quoted from *Better Beverages, Inc. v. United States*, 619 F.2d 424 (5th Cir. 1980), seemingly precludes the post-acquisition allocation of a portion of the purchase price to an asset unless contemplated at the time of the acquisition. The court in *Better Beverages* emphasized, however, that the case before it concerned the allocation of basis to a covenant not to compete. The court therefore held

the taxpayer to a higher standard of proof than would be necessary to establish the bases of most other assets.

As to most physical assets and many intangibles, such as copyrights or patents, there may be a sufficient correlation between the value of the item to the buyer and its value to the seller to render evidence of the former probative of the latter, and therefore, of cost. * * *

Covenants not to compete are not of this ilk, however. First, they generally are not susceptible to an abstract fair market valuation, because they are not independently traded and, thus, have little or no cognizable value apart from the context of a seller's conveyance of his business. More importantly, unlike the simple transfer of ownership in a conventional sale, the interest relinquished by the seller in executing a covenant not to compete is not parallel to that sought or received by the buyer. The value of such a covenant to a purchaser like Better Beverages, derives from the projected degree of increased profitability and likelihood of survival of its new enterprise attributable to the insulation of that enterprise, afforded by the covenant, from the deleterious competitive force that the seller could present. Value to the seller, on the other hand, is the measure of his foregoing the opportunity to re-enter a particular market for a given period. Consequently, because they are functions of totally independent sets of considerations, the respective values of the covenant to the buyer and seller are simply unrelated. For example, while a buyer may place great significance on the covenant as a protective device, a seller, who either does not desire to re-enter the market or who is independently foreclosed from re-entry, may place virtually no value on the same covenant. Accordingly, evidence and allegations of the value of a covenant to its purchaser, not communicated to the seller during negotiations or at the time of sale, simply cannot alone predict the countervailing value to the seller or answer the more fundamental question of actual cost basis.

[619 F.2d at 429. Fn. ref. omitted.]

A covenant not to compete is not an asset of the seller's business, but an independent undertaking of the seller. Consistent with *Better Beverages*, the courts generally require a purchaser to prove that the parties intended, at the time of the acquisition, to allocate a specific portion of the purchase price to the covenant. Mere proof that the covenant possessed value typically is insufficient to establish the purchaser's basis therein. See, e.g., *Theophelis v. United States*, 751 F.2d 165 (6th Cir. 1984); *Markham & Brown, Inc. v. United States*, 648 F.2d 1043 (5th Cir. 1981); *Peterson Machine Tool, Inc. v. Commissioner*, 79 T.C. 72 (1981), affd. in an unreported opinion (10th Cir. 1984), 54 AFTR 2d 84–5139, 84–2 USTC par. 9885); *Major v. Commissioner*, 76 T.C. 239 (1981).

Commercial exigencies often prevent the purchaser from separately evaluating each asset before the acquisition.[2] Moreover, although tax reporting often compels an apportionment of the aggregate purchase price among the individual assets, the purchaser of an operating business is buying a unitary economic enterprise, not a basket of discrete assets. The information yielded by an item-by-item appraisal may thus be of little use to a purchaser, like petitioner, who bases his investment decisions upon earnings or return on investment rather than underlying asset values. The seller may be indifferent to individual asset allocations even for tax purposes where, as in the current case, a complete liquidation is to follow the sale. (See sec. 337.)

Specific allocation in the purchase agreement or in negotiations leading thereto may be the best evidence of the purchaser's basis in each asset. Where such evidence is not present, however, we must allocate the aggregate purchase price among the individual assets based upon the evidence available to us. In numerous cases similar to the one now before us, this Court and others have utilized the relative fair market values of the acquired assets in performing this task. See, e.g., *Laird v. United States*, 556 F.2d 1224 (5th Cir. 1977); *KFOX, Inc. v. United States*, 206 Ct. Cl. 143, 510 F.2d 1365 (1975); *Computing & Software, Inc. v. Commissioner*, 64 T.C. 223 (1975); *First Pennsylvania Banking & Trust Co. v. Commissioner*, 56 T.C. 677 (1971); *Victor Meat Co. v. Commissioner*, 52 T.C. 929 (1969). See also sec. 1.167(a)-5, Income Tax Regs. (providing that where the taxpayer acquires a combination of depreciable and nondepreciable property for a lump sum, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of the acquisition bears to the value of the entire property at that time). The burden of proving the value of each

---

[2]When asked at trial why petitioner did not perform a detailed analysis of the assets and liabilities of Old Athens before the acquisition, petitioner's officer in charge of acquisitions replied:

"you have to understand how the market place works. Whether it's the Lindners connected with Athens National Bank, or most any other bank that we are wanting acquire, it's typically a competitive, or potentially a competitive situation, and there's just no way that a bank, typically, is willing to let you go in and spend all of that time and have all of that involvement and disruption in the bank, before you commit to what it is you're willing to pay. If we insisted on that kind of upfront involvement, we'd never make any deals. We'd never make any acquisitions."

asset of course rests upon petitioner. *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 683–684 (5th Cir. 1971).

### Loan Premium

We conclude that petitioner has not satisfied its burden of proof with respect to the loans acquired by New Athens. We thus reject petitioner's attempt to increase the bases of the loans by use of the loan-spreading process.

According to petitioner, both the methodology utilized and the results obtained are consistent with *Commissioner v. Seaboard Finance Co.*, 367 F.2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court. In *Seaboard Finance*, the Ninth Circuit Court of Appeals affirmed this Court's allowing the taxpayer to allocate a portion of the acquisition prices of several loan companies to loan premiums.

Although the taxpayer in *Seaboard Finance*, like petitioner, determined the amount of the premiums by loan spreading, *Seaboard Finance* is readily distinguishable from the present case. The taxpayer in *Seaboard Finance* performed the spreading process in calculating the values of the loans to be purchased and used the values so calculated in formulating its offering prices to the sellers. Moreover, the uncontradicted evidence indicated that, at the times of purchase, the loans were worth the amounts determined by the taxpayer. See *Seaboard Finance Co. v. Commissioner*, T.C. Memo. 1964–253, 23 T.C.M. 1512 at 1516–1517, 1534, 33 P-H Memo T.C. par. 64,253, at 64–1660, 64–1679. The taxpayer in *Seaboard Finance* thus established that it paid for the loans amounts exceeding their face values.

In the present case, by contrast, petitioner has not shown that it paid more than book value for the Old Athens loans. Although petitioner did consider the loans in evaluating the proposed acquisition of Old Athens, petitioner did not utilize the loan "values" as determined by Coopers in negotiating an acquisition price with Old Athens. The loan spreading performed by Coopers was merely a post-acquisition means of allocating the purchase price among the acquired assets. As discussed above, pre-acquisition allocation is evidential but not essential. But here, petitioner has not otherwise proved that the fair market value of the loans exceeded their book value on the date of the acquisition. For financial accounting purposes,

petitioner attempted to restate the assets acquired from Old Athens at fair market values. In so doing, petitioner reduced the aggregate carrying value of the loans by $389,000. The stated purpose of this adjustment was "to adjust the interest rates on loans to current rates charged by the bank." Indeed, the evidence indicates that the yields on the loans were generally lower than market rates for similar loans on the date of the acquisition and thus that the loans were actually worth *less* than face. Grover testified that, at the time of the acquisition, the loans could not have been sold "for their premium values." See *Southern Bancorporation v. United States*, 732 F.2d 374, 378 (4th Cir. 1984).

Petitioner attempts to prove that the loans possessed value exceeding the face amounts by linking the deposits and loans of Old Athens. Even if the yields on the loans were below market, according to petitioner, the loans were worth more than face because they were funded with deposits having a still lower effective cost. Petitioner points out that one of the criteria utilized in spreading the loans was whether the borrower maintained a deposit account with Old Athens.

Petitioner's argument is unsupported by the evidence. Although the borrower's deposit or other relationship with Old Athens was a factor used in spreading the loans, petitioner's assumption that deposits were economically or contractually tied to loans is pure speculation. There is no evidence that Old Athens' loan customers in fact had deposits with the bank, much less that each customer maintained loans and deposits with relatively equal balances and maturities. Presumably Old Athens could have transferred its deposits and its loans to different purchasers or in separate transactions. The acquirer of the deposits might be willing to assume the liability in exchange for an amount of cash less than the deposit balance, if he could deploy the funds at rates exceeding the costs of maintaining the deposits. The acquirer of the loans, on the other hand, generally would be willing to pay more than face amount only if the stated yield exceeded the market rate on similar loans. We do not doubt that deposits are the source of loans or that banks manage the two relationships in tandem.

We merely reject petitioner's attempt to attribute to loans the value inherent in deposits.[3]

## Core Deposits

We now turn to petitioner's argument raised in its amended petition that a portion of the acquisition prices of both Old Athens and First Citizens is allocable to a core deposit intangible. According to petitioner, it has established a value for the core deposits separate from goodwill and any other nondepreciable intangible asset and has determined the useful life of the intangible with reasonable accuracy. Petitioner thus contends that it has satisfied the requirements prescribed in section 1.167(a)–3, Income Tax Regs., *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240 (5th Cir. 1973); and *L.A. Central Animal Hospital v. Commissioner*, 68 T.C. 269 (1977)), for depreciation of an intangible asset.

Respondent admits that the core deposits acquired by petitioner possessed value. He argues, however, that the value attributable to the core deposit base of a bank constitutes or is inseparable from goodwill or other nondepreciable intangibles and that the depositor base is "self-regenerative" and thus does not possess a determinable useful life. Respondent further asserts that petitioner has failed to quantify accurately the value of the core deposits acquired from Old Athens and First Citizens. Finally, respondent contends that petitioner has not established a proper method for depreciating the deposits.

We agree with respondent's final contention, although not for the reasons suggested by respondent. The reports prepared by PM were the only evidence submitted by petitioner to calculate depreciation with respect to the core deposits, and those reports relied upon events occurring after the years in issue. Therefore, even if we were to hold that petitioner has established its bases in the deposits and that the core deposit intangible is a depreciable asset, we could not allow petitioner depreciation deductions on the record before us.

---

[3]In commenting upon petitioner's loan spreading procedure, one of petitioner's expert witnesses testified: "I thought the methodology was definitely reasonable; that the results seemed to be accurate based upon the methodology utilized; and that the results of the entire transaction were certainly reasonable." Like all of the evidence cited by petitioner in support of its loan premium theory, the above testimony does not indicate that the loans, separate from the deposits, possessed value exceeding the face amounts.

A taxpayer may establish the useful life of an asset for depreciation based upon his own experience with similar property or, if his own experience is inadequate, based upon the general experience in the industry. Sec. 1.167(a)–1(b), Income Tax Regs. The taxpayer need only determine a "reasonable approximation" for depreciation; absolute certainty is not required. *Burnet v. Niagara Falls Brewing Co.*, 282 U.S. 648 (1931); *Super Food Services, Inc. v. United States*, 416 F.2d 1236 (7th Cir. 1969); *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916 (1976). As the Supreme Court noted in *Massey Motors, Inc. v. United States*, 364 U.S. 92, 105 (1960): "prediction is the very essence of depreciation accounting."

This Court and others have repeatedly stated, however, that the determination of the useful life of an asset and the other estimates utilized in computing depreciation must be based upon facts existing as of the close of the taxable year in issue. See, e.g., *Western Terminal Co. v. United States*, 412 F.2d 826 (9th Cir. 1969); *Commissioner v. Cleveland Adolph M.R. Corp.*, 160 F.2d 1012 (6th Cir. 1947); *Roy H. Park Broadcasting v. Commissioner*, 78 T.C. 1093 (1982); *Airport Building Development Corp. v. Commissioner*, 58 T.C. 538 (1972); *Westinghouse Broadcasting Co. v. Commissioner*, 36 T.C. 912 (1961), affd. 309 F.2d 279 (3d Cir. 1962). Thus, in determining the useful life of the taxpayer's freight cars in *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 668 (1980), we refused to consider statistical studies of experts that utilized facts occurring after the years in issue:

Indeed, this evidence is singularly unsuitable for the purpose of proving useful life in this case for the reason that * * * [the taxpayer's expert] admittedly employed data in his study from * * * years * * * [subsequent to the years in issue]. * * * [The expert] testified that, without the data from these years, he would not have been able to reach any specific conclusions as to useful life of the postwar cars at the end of * * * [the years in issue]. Since the information relied on by * * * [the expert] in making his analysis was not available for consideration at the end of the years at issue, his conclusions cannot be relied on herein. The * * * statistics which * * * [the taxpayer's expert] employed were obviously not available to petitioner for the making of its contemporaneous determination of useful life. [Fn. ref. omitted.]

See also *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. at 707–708 (similar conclusion with respect to diesel

locomotives).[4] Indeed, the regulations indicate that depreciation must be computed and its validity judged prospectively, not retrospectively:

The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed. [Sec. 1.167(b)–0(a), Income Tax Regs.]

Petitioner argues that the acquired core deposits should be depreciated in accordance with the amortization schedules prepared by PM. Both of those schedules, however, were based upon, and their accuracy depended upon, petitioner's actual experience with the acquired accounts in years subsequent to the years in issue. In preparing the schedule for Old Athens, PM examined sample accounts 2 to 6 years after the acquisition, all of which were subsequent to the years for which petitioner now claims depreciation. Although PM did examine the behavior of First Citizens' accounts during 1974 and 1975, the 2 years in issue, the data upon which PM based its computations also included events occurring during 1976 and 1977. PM stated in the report for First Citizens that the accuracy of the calculations therein was "conditional on the sample of accounts selected." Cf. *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. at 668, quoted *supra*.

The Fourth Circuit articulated the rationale behind the prohibition against using hindsight evidence to compute depreciation as follows:

taxation is made too uncertain and controversies too long extended if what is claimed or allowable as of the time the return is filed is made subject to revision and adjustment by the Commissioner or by the taxpayer in the light of events occurring several years later. What depreciation is allowable, therefore, is determinable on the basis of facts known or reasonably predictable when the return is filed and may not be made dependent upon * * * [events] actually realized in subsequent years. [*Johnson v. Commis-*

---

[4]In *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497 (1980), the taxpayer attempted to establish a shorter useful life than that claimed on its tax returns for the years in issue. We therefore required the taxpayer to show a "clear and convincing basis" for the change. 75 T.C. at 661–664. See secs. 1.167(a)–1(b), 1.167(b)–0(a), Income Tax Regs. Our holding the taxpayer to a higher standard of proof than the "reasonable approximation" normally required to establish useful life was independent from our refusal to consider facts not existing at the end of the years in issue.

*sioner,* 302 F.2d 86, 88 (4th Cir. 1962), affg. a Memorandum Opinion of this Court.]

Petitioner's proposed method of depreciation is similar to that of the taxpayers in *Manhattan Co. of Virginia, Inc. v. Commissioner,* 50 T.C. 78 (1968); *Holden Fuel Oil Co. v. Commissioner,* T.C. Memo. 1972–45, affd. 479 F.2d 613 (6th Cir. 1973); and *Midlantic National Bank v. Commissioner,* T.C. Memo. 1983–581. In each of those cases, we rejected the taxpayer's computation of depreciation of a customer list based upon the number of customers actually lost each year. The method proposed by petitioner for the years in issue is different only in that it is based upon a sample of the deposit accounts actually lost. We see no reason to distinguish between "total" hindsight and "sample" hindsight.

We allowed the taxpayers in the above cases to compute depreciation under alternative methods. In each of those cases, however, there existed evidence of prior experience of the taxpayer or the industry upon which we could base our determinations. Petitioner, in the present case, did present expert testimony on the reasonableness and accuracy of PM's reports and the general nature of core deposits. We cannot find, however, any specific evidence in the record of the experience of petitioner or of any other bank as of the years in issue upon which we might compute depreciation on the core deposits. With the exception of the reports prepared by PM, petitioner has presented no evidence whatsoever of the useful life of, or the general reasonableness of the depreciation claimed with respect to, the acquired deposit accounts. It is one thing to utilize hindsight evidence to *support* a prospective computation, but quite another to base depreciation solely upon subsequent events. Compare *Super Food Services, Inc. v. United States,* 416 F.2d 1236, 1240 (7th Cir. 1969) ("[We] find no objection to taxpayer's adducing evidence of its experience with contract terminations subsequent to the * * * [year in issue] for the purpose of *corroborating* the estimate of useful life of the contracts *based on * * * [prior] experience*"; emphasis added.) with *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. at 669.

*Issue 2: "Second Tier" Allocations*

The final question before us is the validity of petitioner's "second tier" allocations of the acquisition prices. Petitioner argues that it has established fair market values for each asset acquired from Old Athens and First Citizens and that, for each acquisition, the excess of the consideration paid over the aggregate fair market value should be allocated among the assets (other than cash and cash equivalents) based upon relative market values. Respondent asserts that any excess of the purchase price over the aggregate value of the tangible assets is allocable to goodwill and other nondepreciable intangibles under the "residual method" of valuation. We hold for respondent on this issue.

Both acquisitions were transactions between unrelated parties, and therefore the purchase prices are the best evidence of the fair market values of the acquired assets. *Florida Publishing Co. v. Commissioner*, 64 T.C. 269, 279–280 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977). Moreover, the parties do not dispute the values of any of the tangible assets acquired, except the Old Athens loans.[5] Since petitioner has not proven that the value of those loans exceeded their face amounts, this case represents the paradigm for application of the residual method. See *Solitron Devices, Inc. v. Commissioner*, 80 T.C. 1, 20–22 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984); *R.M. Smith, Inc. v. Commissioner*, 69 T.C. 317, 320 (1977), affd. 591 F.2d 248 (3d Cir. 1979); *Jack Daniel Distillery v. United States*, 180 Ct. Cl. 308, 379 F.2d 569, 579 (Ct. Cl. 1967). "Under such method, the value of the intangible assets equals the difference between the total purchase price and the value of the tangible assets." *Solitron Devices, Inc. v. Commissioner*, 80 T.C. at 22.[6]

Petitioner argues that under the opinion of the Third Circuit Court of Appeals in *R.M. Smith, Inc. v. Commissioner*, 591 F.2d 248 (3d Cir. 1979), affg. 69 T.C. 317 (1977), we should not utilize

---

[5]We recognize that loans are technically intangible assets. For clarity of discussion, however, we shall refer to all of the assets carried in the financial records of Old Athens and First Citizens as tangible assets.

[6]Because we have held that petitioner is not entitled, on the record before us, to depreciate any core deposit intangible acquired in the transactions, we need not determine whether core deposits possess value separate from goodwill and other nondepreciable intangible assets or, if so, the value of the deposits for the purpose of applying the residual method. Core deposits, like goodwill, will constitute a portion of the residual after subtraction of the tangible asset values.

the residual method to value the nondepreciable intangibles in the present case. The Third Circuit in *R.M.. Smith* recognized that a determination under the residual method is not conclusive of the value of the intangible assets. Although the purchase price is presumed to represent the fair market value of the acquired assets, either party may introduce evidence to rebut that presumption and thereby change the calculated residual value.

As pointed out earlier, the theoretical underpinning of the residual value method is that the total price paid for the stock equals the sum of the fair market values of all of the underlying assets. Although this is a sound principle in economic theory, in reality it has its shortcomings. Specifically, it fails to take into account the common situation when one party to the transaction achieves a bargain. If the purchaser of the stock obtains a "good deal," then the residual value method would undervalue the goodwill. If, on the other hand, the price paid is too high, then the computation will result in a correspondingly inflated goodwill figure. This problem does not require rejection of the residual value method—price paid *is* strongly probative, albeit not conclusive, of fair market value. However, it does suggest that the court consider evidence which would require alterations in the figure or abandonment of the formula altogether.

\*　　\*　　\*　　\*　　\*　　\*　　\*

\* \* \* the residual value method is an appropriate means for deriving the value of intangible assets as long as the total price paid and the values of all other assets are known. The resultant figure, however, is not to be deemed conclusive proof of the unknown value. Evidence suggesting that a fair deal was not reached should be permitted. When appropriate, adjustments should be made in the value assigned to the intangible assets, or a different basis for deriving the figure should be substituted.
[591 F.2d at 252–253.]

In the present case, however, petitioner has not proven that it paid more than the aggregate value of the various assets for either Old Athens or First Citizens.

Petitioner's only evidence on this point is testimony that the profit from the Cincinnati loan and lease transactions produced abnormally high earnings for Old Athens before the acquisition; petitioner thus implies that petitioner paid more for the bank than the true value of its underlying assets. We cannot draw that inference in light of the history of the negotiations and preclosing examinations.

Petitioner knew and intended from the outset that New Athens would not continue the Cincinnati transactions (other

than retaining the existing leases). The merger agreement required that the Cincinnati borrowers pay off their loans before consummation of the transaction. Both Grover and petitioner welcomed the termination of the Cincinnati dealings, in light of the expectation that additional funds could be deployed very profitably in the Athens area.

Petitioner's obligations under the merger agreement were contingent upon there being no adverse change in the financial position, business, or aggregate net assets of Old Athens from June 30, 1973, until the date of the merger. Petitioner's officer in charge of acquisitions testified that the purpose of this clause was to allow petitioner to avoid closing the transaction "if the financial condition of the bank, at the time of closing is materially different from what had been represented to us in the various documents and what we had anticipated getting." Coopers began gathering data for the purpose of assigning values to the acquired assets in February or March of 1974; petitioner performed a preclosing examination of Old Athens before consummation of the merger on September 13, 1974; and yet petitioner did not attempt to avoid or change the terms of the transaction. We must therefore conclude that, on the effective date of the merger, petitioner believed it was receiving its money's worth in the acquisition. Coopers completed the allocation of the purchase price only a few months later, and nothing indicates that petitioner's expectations changed in that short time.[7]

We finally note that, in 1975 and 1976, the average amount reported by New Athens as "interest and fees on loans" exceeded the amounts reported by Old Athens in each of the 4 years prior to the acquisition and that Lindner's representative initially proposed a cash price of $13 million, $3 million more than ultimately agreed upon.

Petitioner does not assert that it made a bad bargain in the acquisition of First Citizens and such an argument is not supported by the evidence. First Citizens possessed no qualified management and had experienced problems with its loans. Yet petitioner was well aware of these facts and

---

[7]Petitioner's officer testified that "we thought it was a fair price at the time [of the acquisition]" but that "I'm sure that two or three years after the transaction, we would have said, 'Gee, we wouldn't have paid that much for that bank.' " It is value at the time of the acquisition and not 2 or 3 years later than is relevant for our decision.

undoubtedly adjusted its offering price accordingly; the purchase agreement even provided that the ultimate purchase price depended upon the collectibility of problem loans.

Petitioner argues that under *Victor Meat Co. v. Commissioner*, 52 T.C. 929 (1969); *United States v. Cornish*, 348 F.2d 175 (9th Cir. 1965); sec. 1.167(a)–5, Income Tax Regs.; Rev. Rul. 69–539, 1969–2 C.B. 141; and Rev. Rul. 77–456, 1977–2 C.B. 102, the aggregate purchase prices should be allocated among all the acquired assets in proportion to their fair market values. The method proposed by petitioner would result in an allocation different from our determination under the residual method, however, only if the aggregate fair market value of the assets received from Old Athens and First Citizens were not equal to the respective acquisition prices. Petitioner apparently realizes this plain fact in arguing that the cited authorities reflect "the basic tax law principle that a taxpayer shall be allowed as a basis for depreciation the actual cost of an asset, *even if that cost exceeds fair market value.*" (Emphasis added.) But a taxpayer who pays a lump-sum amount for a number of assets may not attribute the cost basis of nondepreciable assets to that of depreciable assets. Sec. 1.167(a)-5, Income Tax Regs. Each of the authorities cited by petitioner thus presumes that the fair market value of each asset is accurately determined before performing the allocation based on relative fair market values. In *Victor Meat Co.*, for example, the parties stipulated the fair market value of every asset acquired. Allocation was necessary only because the sum of the individual asset values did not equal the total purchase price.

Just as petitioner failed to prove that it paid more than fair market value for the assets of Old Athens and First Citizens, petitioner has not demonstrated that it accurately determined the value of each asset acquired.

Petitioner asserts that Coopers properly determined that the value of the "goodwill and other intangibles" acquired from Old Athens was $244,059 and that First Citizens possessed no goodwill. Both calculations were based upon the "formula" or "excess earnings" method of valuing goodwill, a method petitioner urges that we utilize instead of the residual method. According to petitioner, these calculations conformed to the process prescribed in Rev. Rul. 68–609, 1968–2 C.B. 327.

We note, initially, the difficult and uncertain assumptions demanded by such a computation of intangible value based upon the capitalization of excess earnings. Determination of the "normal" earnings of a business, the "average" return on the tangible assets, and the "appropriate" capitalization rate is a highly subjective task. Indeed, the primary virtue of the residual method is obtaining a more accurate valuation of the acquired intangibles without making speculative assumptions and engaging in unnecessarily complex computations, where the total purchase price and the values of the tangible assets are known or ascertainable.

Admittedly, we do not always have the luxury of using the residual method of valuation. See *Concord Control, Inc. v. Commissioner*, 78 T.C. 742 (1982) (formula method utilized where value of tangible assets not reasonably ascertainable).[8] As discussed above, however, use of the residual method is proper in the present case, and we would reject Coopers' determinations under the formula method on that basis alone.

We have nevertheless considered Coopers' determinations under the formula method and found Coopers' computations inadequate. The premise of the formula method is that goodwill and other intangibles often manifest themselves through earnings in excess of the return on *tangible* assets. See, e.g., *Concord Control, Inc. v. Commissioner, supra.* Coopers instead computed the goodwill of Old Athens and First Citizens based upon earnings in excess of the average *total* return for the industry, not only the return on tangibles.[9] We would expect these two measures of excess earnings to be relatively equivalent only if goodwill and other unrecorded intangibles were rare in the industry. If, on the other hand, firms in the industry typically possessed goodwill or other intangible asset value, the average industry earnings would include some return on those intangible assets. Comparing the earnings of an individual firm like Old Athens or First Citizens with the industry average would therefore understate the value of the firm's intangibles. We thus reject petitioner's

---

[8]We were similarly unable to utilize the residual method in *Seaboard Automotive, Inc. v. Commissioner*, T.C. Memo. 1981–392 (value of purchased assets exceeded purchase price), and in *Sanders v. Commissioner*, T.C. Memo. 1973–75 (gratuitous transfer of goodwill), cited by petitioner.

[9]Rev. Rul. 68–609, 1968–2 C.B. 327, 328, upon which petitioner relies, provides: "The percentage of return on the average annual value of the *tangible* assets used should be the percentage prevailing in the industry involved at the date of valuation * * *" (Emphasis supplied.)

repeated assertion that "there is no goodwill unless there is also an expectancy of continuing excess earnings capacity," in that petitioner refers to excess over the industry average *total* return. None of the cases cited by petitioner so defines excess earnings. See *VGS Corp. v. Commissioner*, 68 T.C. 563 (1977); *Wilmot Fleming Engineering Co. v. Commissioner*, 65 T.C. 847 (1976); *Proctor v. Commissioner*, T.C. Memo. 1981–436.

In *Ballantine v. Commissioner*, 46 T.C. 272, 278 (1966), we determined that an unprofitable business possessed goodwill:

Respondent argues that because of the poor earnings record of petitioners with the * * * [business] there was no goodwill attached to the business. While the value of goodwill is often sought from consideration of excess earnings, and goodwill is often used in that context, certainly goodwill may arise from something other than excess earnings. * * * It has been said that goodwill is nothing more than the probability that the old customers will resort to the old place. The assets purchased by the buyers in this case were acquired primarily to produce such a result. We doubt that the value of the goodwill, trade name, and circulation lists of the * * * [business] was reduced by the fact that the * * * [business] lost money while petitioners operated it or that the losses resulted from a lack of value in those assets. [Citations omitted.]

Excess earnings, however defined, are thus merely indicia of goodwill. As petitioner asserts, we have stated:

goodwill exists where there is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage." *Wilmot Fleming Engineering Co. v. Commissioner*, 65 T.C. 847, 861 (1976). [*Midlantic National Bank v. Commissioner*, T.C. Memo. 1983–581, 46 T.C.M. 1464, at 1470, 52 P-H Memo T.C. par. 83,581, at 83–2374. Fn. ref. omitted.]

It does not necessarily follow, however, that goodwill *cannot* be present in the absence of excess earnings capacity. Cf. *Concord Control, Inc. v. Commissioner*, 615 F.2d 1153 (6th Cir. 1980), affg. a Memorandum Opinion of this Court; *Miller v. Commissioner*, 39 T.C. 940 (1963) (holding that excess earnings alone not sufficient to establish goodwill), affd. 333 F.2d 400 (8th Cir. 1964). A business might possess substantial goodwill or other intangible value and yet be confronted with a substandard tangible asset base or abnormally high operating costs and thus not realize earnings in excess of a normal return on tangible assets.

The Supreme Court long ago defined goodwill as—

the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices. [*Metropolitan Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893).]

"[T]he essence of goodwill is the expectancy of continued patronage, for whatever reason." *Boe v. Commissioner*, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961). See also *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677 (5th Cir. 1971), and cases cited therein.

Going-concern value, also a nondepreciable intangible, is "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *VGS Corp. v. Commissioner*, 68 T.C. at 591. It is manifested by "the ability of the acquired business to continue generating sales without interruption during and after acquisition." *Solitron Devices, Inc. v. Commissioner*, 80 T.C. 1, 20 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984).[10]

Examining Old Athens in light of these characteristics confirms our valuation under the residual method. Old Athens was by far the largest bank in Athens County and New Athens continued to use the undoubtedly familiar name of "Athens National Bank." In Grover, the bank possessed an experienced chief executive who was visible and active in the community and had acquired most of the local business accounts. The record indicates that both Grover and petitioner intended to utilize Grover's banking experience and stature in the community to ensure that the old customers returned to the old place of business after the acquisition. It is of little consequence that Grover did not sign an employment contract with New Athens. The clause in the merger agreement prohibiting Grover from working for United Dairy indicates the parties' intention that

---

[10]Petitioner presented at trial reports in which Coopers calculated the going-concern value of Old Athens at $314,000 and of First Citizens at $94,000 as of the acquisition dates. Because both goodwill and going-concern value are nondepreciable, and because we have properly utilized the residual method herein, we need not separately examine going-concern value. See *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677 (5th Cir. 1971); *Computing & Software, Inc. v. Commissioner*, 64 T.C 223 (1975); cf. *supra* note 6.

Grover remain at New Athens. Finally, almost all of the other employees remained with New Athens as well.

Turning to First Citizens, we recognize the absence of an experienced executive, the small market share controlled by the bank, and the other factors indicating that the goodwill and going-concern value of First Citizens was lower than that of Old Athens. First Citizens was an operating and profitable bank, however, and Barnitz continued to use the name "First Citizens" and to employ its personnel. In any event, the value of the core deposits of First Citizens, as determined by PM and asserted by petitioner, far exceeds the excess over book value paid for First Citizens.[11]

*Decision will be entered under Rule 155.*[12]

---

[11]See *supra* note 6.

[12]In the statutory notice of deficiency, respondent denied all deductions claimed by petitioner to the extent that the deductions were based upon costs in excess of the book values of the acquired assets. In his briefs, respondent apparently acquiesces, with respect to most assets, in petitioner's use of cost bases equal to fair market values as of the acquisition dates. Because several of the assets acquired by petitioner had fair market values *below* their book values, allowing petitioner cost bases equal to fair market values does not necessarily reduce the deficiencies determined by respondent. Because of this uncertainty, we are directing a Rule 155 computation.